IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| CECIL CLAYTON, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Case No. 02-8001-CV-W-NKL |
| ) | |
| AL LUEBBERS, ) | |
| Superintendent, Potosi ) | |
| Correctional Center, ) | |
| ) | |
| Respondent. ) | |

**ORDER**

Pending before the Court is Petitioner's Renewed Motion for Stay of Proceedings [Doc. # 93]. For the reasons set forth below, the Motion is denied.

Cecil Clayton ("Clayton") filed his pending petition for habeas corpus on January 20, 2003 [Doc. # 46]. From the outset of these proceedings, Clayton's counsel has stated that Clayton is incompetent to pursue his habeas corpus Petition and these proceedings should be stayed. In order to finally resolve the issue, the Court ordered Clayton to undergo psychiatric evaluation at the Medical Center for Federal Prisoners ("MCFP") [Doc. # 79].

In January 2005, Lea Ann Preston, Ph.D., a staff member at the MCFP in Springfield, Missouri, submitted her Forensic Report. Clayton's counsel subsequently renewed his Motion for Stay and Appointment of Next Friend, which is the Motion currently pending before the Court [Doc. # 93].

1

## I. Clayton's Background[1]

Mr. Clayton described himself as a good student during elementary school. He denied a history of special education classes or being required to repeat a grade. He also denied a significant history of truancy or behavioral problems. The available records confirm his self-report. He reportedly related well to his teachers and peers during elementary school. However, his peer relationships reportedly became more difficult for him as an adolescent due to his self-consciousness related to his severe acne. During this time, he reportedly often engaged in physical altercations. He reportedly withdrew from school after completing the tenth grade. He has not obtained a GED.

Mr. Clayton reported he worked in the saw mill industry "off and on for 40 years." According to the available records, he owned his own saw mill business from 1967 until 1972. Following his head injury in 1972, he reportedly had difficulty maintaining consistent employment. In the mid-1970's, he reportedly worked as a police officer for the City of Purdy, Missouri, for approximately nine months. According to Mr. Clayton, he had difficulty maintaining this position as he found it to be difficult and stressful. Although he had reportedly been sober for a number of years prior to working as a police officer, he reportedly began drinking again during this time period in an effort "to calm his nerves." After leaving this position, he reportedly worked briefly at a tire company and a tree trimming business. He was eventually awarded Social Security Disability benefits on November 18, 1977.

Mr. Clayton described a long history of alcohol dependence, beginning in his early adolescence. He stated that he often became violent when intoxicated and engaged in behavior that he later regretted. He related that he has received three convictions for Driving While Intoxicated and has been court-ordered to participate in substance abuse treatment on at least two different occasions. He indicated he has also used cocaine, marijuana, and amphetamines, but he denied ever being addicted to these

---

[1]The factual information contained in this Order is drawn from the Forensic Report submitted by Dr. Preston [Doc. # 103]. Although the Court has included only part of Dr. Preston's report, it has considered the entire report. While the Court gave Clayton funds to retain his own expert and the expert conducted an in-person evaluation of Clayton, Clayton has not submitted any report, or even partial findings, from his expert to contradict or clarify the findings of Dr. Preston or the facts she relied on.

2

substances.

> Mr. Clayton reported that he has incurred a number of head injuries of varying degrees of severity over the years. In 1950, he was reportedly rendered unconscious for a brief period of time after he fell out of a large tree and hit his head. He did not receive medical treatment for this injury. In 1958, he was again rendered unconscious after being "thrown through the windshield of a car" during a head-on collision. He indicated that he incurred lacerations to his face and a broken nose during this accident. He stated he left the hospital against medical advice the day after the accident. In the early 1960's, he was reportedly hit in the head with a state trooper's "blackjack." He stated that he was not rendered unconscious but claimed he experienced "severe headaches" and "ringing in his ears" following this incident.
>
> On January 24, 1972, Mr. Clayton's most serious head injury occurred. According to the available information, while working at his sawmill, a splinter of wood penetrated his skull and lodged in the right frontal area of his brain. Following this injury, he was initially taken to St. Vincent's Hospital in Monett, Missouri, but given the severity of his injury, he was quickly transferred to St. John's Regional Hospital in Springfield, Missouri. Radiographic studies, completed at St. John's Hospital, showed "extensive shattered fracture of upper border of right orbit and depressed skull fracture right frontal region measuring 3 cm by 1.5 cm at the depth of 1 cm." John L. K. Tsang, M.D., subsequently performed emergency surgery, with debridement and closure of the frontal laceration. A neurological surgery report, completed by Dr. Tsang, dated January 26, 1972, noted there was "approximately 3 cc of brain tissue loss in that area" after the wood and bone fragments were removed.

Forensic Report ("F.R.") at pp. 5-6.

## II. Earlier Competency Evaluations

### A. Bettye Back, Ph.D.

In June 1997, Bettye Back, Ph.D., consulted with Clayton for a neuropsychological evaluation. According to her deposition testimony given in September 1997, Dr. Back reviewed Clayton's prior medical records, interviewed him, and administered

3

neuropsychological testing. On the Wechsler Adult Intelligence Scale-Revised ("WAISR"), Clayton obtained a Full Scale IQ of 86, a Performance IQ of 84, and a Verbal IQ of 88. These results placed Clayton in the low average range of intellectual functioning. On the Wechsler Memory Scale ("WMS"), Clayton's overall memory quotient was 76, which placed him in the borderline range of memory functioning. Dr. Back found that Clayton met the diagnostic criteria for dementia, due to head trauma; alcohol abuse (maybe dependence); and antisocial personality disorder, but Dr. Back did not specifically address Clayton's ability to assist his trial counsel.

In October 2000, after Clayton was convicted of the underlying offense, Dr. Back was deposed. Under questioning regarding Clayton's competency to stand trial, Dr. Back stated that if she believed Clayton had not been competent to stand trial, then she would have so advised his trial counsel. Dr. Back also stated that Clayton had been competent to stand trial, saying, "I felt like he was able to assist [his counsel] and to tell [his counsel] what had happened to the best of his ability . . . . He was not mentally retarded. He was not actively psychotic at the time." Dep. of Dr. Back, Resp. Ex. I-1 at pp. 77:25-78:4.

### B. Daniel V. Foster, Psy.D.

In January 2000, after Clayton was convicted for the underlying offense, Daniel V. Foster, Psy.D., evaluated him. Dr. Foster reportedly met with Clayton for 4.3 hours, cutting the interview short "due to Clayton's inability to meaningfully proceed." During the interview, Clayton demonstrated an adequate factual understanding of his legal situation and the roles of courtroom participants. However, Dr. Foster found that

4

Clayton's "distractibility, emotional ability, and poor concentration preclude his meaningful participation in procedures that last for hours or days . . . . His impairment is not one of base intelligence but frequent and random interference both by scar tissue present and even more so by the brain tissue no longer present . . . . He is inconsistently incompetent . . . . It is his inability to recall facts on demand that impairs his competency." F.R. at p. 11. Dr. Foster additionally found that Clayton did not have the capacity to cooly deliberate at the time of the offense. Resp. Ex. G-3 at p. 364.

## III. MCFP Forensic Report

Clayton was evaluated by staff members at the MCFP from May 2004 to January 2005. Dr. Preston met with Clayton on at least a weekly basis. She stated he "displayed significant difficulty in remaining focused on the topic at hand and would often go on tangents telling stories about topics which were completely irrelevant and unrelated to the topic being discussed." F.R. at p. 13. Dr. Preston found that Clayton had trouble inhibiting the expression of his thoughts. She did not observe any bizarre behaviors and his conduct was "well-organized and goal-directed." *Id.*

### A. Clinical Formulation and Diagnoses

> Neuropsychological testing completed during the present evaluation indicated that Mr. Clayton has moderate to severe, diffuse and static, bilateral brain damage that has a significant effect on his ability to function in both sensory and motor realms. His most prominent deficits were functional impairments customarily considered frontal lobe in nature. More specifically, he demonstrated significant deficits in judgment, problem-solving, mental flexibility, processing speed, and inhibition. His most incapacitating deficits were likely his impaired judgment and inability to inhibit the expression of thoughts. His disinhibition is likely a significant

5

factor in his difficulty in attending to and concentrating on even highly structured tasks. These impairments are consistent with the MRI results showing bilateral frontal lobe abnormality and SPECT results suggesting hypometabolism in the right frontal area. Frontal damage of this type tends to impair attention by heightening the level of arousal, such that specific relevant perceptions are not distinguished from irrelevant or inappropriateness. Relative cognitive strengths included his knowledge of vocabulary, despite a low reading level, and his visuospatial constructional abilities. His ability to learn new material was weak, although he did exhibit the ability to retain information when it was repeated several times. He was able to accurately reproduce auditory and visual information that had been presented to him with repetition, even after a delay. Although it is certainly understandable why he has been given the diagnosis of dementia in the past, the current neuropsychological testing results suggest that the diagnosis of cognitive disorder, not otherwise specified, is more appropriate. As noted previously, significant impairment in memory is a requirement for the diagnosis of dementia. During the current evaluation, his performance on tests assessing memory, although weak at times, did not suggest severe impairment.

> As described above, Mr. Clayton has a well-documented history of periodically experiencing visual and auditory hallucinations since his brain injury. His description of these hallucinations appear genuine in that they are consistent with the type of hallucinations that can be created by significant brain damage. Consequently, the diagnosis of psychotic disorder, with hallucinations, due to traumatic brain injury, appears indicated.

F.R. at p. 28.

> Lastly, it is also important to note that during the present evaluation, Clayton's performance on tests sensitive to exaggeration was variable, which may render the test results less reliable than if he had given his best effort on all tests. Given Mr. Clayton's legal situation, however, exaggeration on some tests in order to appear impaired is not surprising. Behavioral observations during this evaluation, as well as consistent documentation of similar functional impairment in the records, support the conclusion that Mr. Clayton has significant brain damage with legitimate deficits in judgment, problem-solving, mental flexibility, processing speed, and thought inhibition.

6

F.R. at p. 29.

Dr. Preston made the following diagnosis in accordance with the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition:

Axis I:    Cognitive disorder, not otherwise specified
           Major depressive disorder, in remission with anti-depressant medication
           Alcohol dependence, in a controlled environment
           Psychotic disorder, with hallucinations, due to traumatic brain injury

Axis II:   Adult antisocial behavior

Axis III:  History of traumatic brain injury
           History of myocardial infarction
           History of triple bypass surgery
           Hypertension

F.R. at p. 29.

### B.    Dr. Preston's Conclusion

Dr. Preston's summation was organized according to the specific questions asked by the Court in its evaluation Order.

#### 1.    *Is Clayton suffering from a mental defect or disease?*

Dr. Preston concludes that Clayton is suffering from a mental defect or disease. F.R. at p. 30.

#### 2.    *Is Clayton incapable of rationally understanding the habeas proceedings?*

Dr. Preston concludes that Clayton was capable of rationally understanding the habeas proceedings. To support her conclusion, she pointed to his demonstrated factual understanding of the legal system and the process of adjudication. In sum, she

determined, "His cognitive deficits did not appear to negatively impact his ability to understand his present legal proceedings."  F.R. at p. 30.

> ### 3. *Is Clayton incapable of communicating with and assisting his counsel or testifying in these proceedings if necessary?*
>
> Although the term "incapable" is too strong of a word, Mr. Clayton's cognitive deficits will negatively impact his ability to communicate effectively with his defense counsel, assist properly in his defense, and testify relevantly.  His performance on the ECST-R demonstrated that he has a positive view of his defense counsel and rational expectations regarding her abilities.  In addition, his performance on this measure suggested that he has an adequate knowledge of his attorney's expectations of his role, and he denied experiencing significant disagreements with her.  However, his performance on the MacCAT-CA and his presentation during clinical interviews illustrated that his tangential speech, poor thought inhibition, and poor reasoning skills will negatively impact his ability to relay information to his defense counsel in a coherent and meaningful manner.  Similarly, it is expected that these cognitive deficits will also impair his ability to testify in a relevant manner.  As described above, Mr. Clayton demonstrated extreme difficulty remaining focused during clinical interviews as well as during the administration of structured assessment instruments.  His responses to queries were often irrelevant and tangential.  When re-directed, he would attempt to respond relevantly but generally would lose focus and begin discussing irrelevant topics again.  **With repeated questioning, it was generally possible to obtain accurate factual information from Mr. Clayton.  However, this was a time-consuming process which required a great deal of patience and persistence.  Detailed knowledge of the topic being discussed was extremely helpful because it facilitated the development of appropriate follow-up questions necessary to obtain the desired information.**  When I attempted to interview Mr. Clayton regarding the content of his petition for Writ of Habeas Corpus prior to having obtained my own copy of this document, I experienced a great deal of difficulty understanding his responses and obtaining useful information.  It is likely that his defense counsel would face similar difficulties if trying to obtain information from him about his case which is not available from other sources.

F.R. at pp. 30-32 (emphasis added).

In her closing remarks, Dr. Preston stated:

> The ultimate determination of whether [Clayton] is competent to proceed depends a great deal on what demands will be placed on him during the habeas proceedings. If demands placed upon him are limited to his ability to understand the process and information his attorney provides to him, then I believe it is unlikely his cognitive defects will hinder his competency. However, the more participation that is required of him during his legal proceedings, the more his cognitive defects will negatively impact his competency. . . . Consequently, it is my opinion he is likely not competent to proceed.

F.R. at p. 32.

### 4. *Is Clayton unable to make rational choices with respect to the habeas proceedings?*

Dr. Preston stated that Clayton is unable to make rational choices regarding his habeas proceeding. She pointed to the neuropsychological test results that indicated he had significant impairments in his problem-solving, judgment, and reasoning.

### 5. *Does Clayton understand that he is to be executed and the reason for his execution?*

Dr. Preston concluded that Clayton is aware that he was convicted of murder and that he is to be executed for that crime.

## IV. Must a Habeas Petitioner be Competent to Assist His Counsel?

### A. *Rohan*

To date, the Supreme Court has not addressed the question of whether a habeas petitioner must be competent to assist his counsel. In *Rohan ex rel. Gates v. Woodford*, 334 F.3d 803 (9th Cir. 2003), however, the Ninth Circuit imposed such a requirement.

In that case, Oscar Gates ("Gates") was sentenced to death for a murder. After his

conviction, he exhausted his claims before the state courts, including his claim that he was incompetent to pursue collateral review.

For the next several years, Gates's competency was litigated in the United States District Court for the Northern District of California to determine his capacity to pursue his habeas petition. Gates's expert and experts procured by the state opined that Gates lacked both an understanding of the proceedings and an ability to rationally communicate with his counsel. Subsequently, the district court held a competency hearing and also determined that he was incompetent to proceed. Rather than stay the proceedings, the court appointed Colleen Rohan ("Rohan") to serve as Gates's next friend and represent his interests in the habeas proceeding.

Rohan soon reported that she also could not pursue Gates's habeas claims because she was unable to communicate rationally with him and she renewed her request for a stay of the proceedings. The district court told Rohan to identify the claims that required Gates's assistance and to describe the information she sought from Gates. Rohan complied but the court again refused to stay the proceedings. The court held that neither due process nor Gates's statutory right to counsel required a stay because Rohan's appointment as next friend protected his rights. The district court held that a habeas petitioner's constitutional right to competency at the trial level did not apply to habeas proceedings because the latter are a "mere 'secondary and limited' component of the criminal justice process." *Rohan*, 334 F.3d at 806 (citation omitted). The district court also noted that Gates's counsel had failed to present a convincing argument that counsel

needed his communication to prepare portions of the habeas petition.

The circuit court reversed the district court and held that capital habeas petitioners have a statutory right to competent counsel and, for that right to be meaningful, the petitioner must be able to assist counsel. The Ninth Circuit noted that two standards for competence had evolved based on the stage of the proceedings. First, there was the standard for competence to stand trial, which required that a defendant have "a rational as well as functional understanding of the proceedings against him" and a "sufficient present ability to consult with [the defendant]'s lawyer with a reasonable degree of rational understanding." *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)). Second, there was the competence to be executed standard, which required only that the convicted defendant be aware of the punishment the defendant was about to suffer and why the defendant was going to suffer it. *Ford v. Wainwright*, 477 U.S. 399, 422 (1986).

In *Rohan*, the Ninth Circuit stated:

> We confront a question that falls somewhere between these two lines of authority: not competence to stand trial or competence to be executed, but competence to pursue collateral review of a state conviction in federal court. Must a district court stay habeas proceedings when a petitioner cannot assist counsel because he is incapable of rational communication?

*Rohan*, 334 F.3d at 810. The Ninth Circuit found that it could infer that a habeas petitioner has a right to be competent because he has a statutory right to counsel in capital cases, and the United States Supreme Court "grounds the constitutional competence-to-stand-trial requirement in the Sixth Amendment right to counsel." *Rohan*, 334 F.3d at

11

813 (citing *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996)). The Ninth Circuit reasoned:

> In capital cases, prisoners challenging their convictions or sentences in federal court have a right to assistance of counsel. 21 U.S.C. 848(q)(4)(B). This prescription reflects Congress's belief that "federal habeas corpus has a particularly important role to play in promoting fundamental fairness in the imposition of the death penalty," and that meaningful assistance of counsel is essential to secure federal constitutional rights. Counsel's assistance, however, depends in substantial measure on the petitioner's ability to communicate with him. And if meaningful assistance of counsel is essential to the fair administration of the death penalty and capacity for rational communication is essential to meaningful assistance of counsel, it follows that Congress's mandate cannot be faithfully enforced unless courts ensure that a petitioner is competent.

*Rohan*, 334 F.3d at 813 (quoting *McFarland v. Scott*, 512 U.S. 849, 859 (1994)).

The Ninth Circuit also relied on its earlier ruling in *Calderon v. U.S. District Court for Central Dist. of Cal.*, 163 F.3d 530 (9th Cir. 1998) (en banc), where it said:

> Under 21 U.S.C. § 848(q)(4)(B), Kelly has a statutory right to counsel in his federal habeas proceeding. That right contemplates effective communication between lawyer and client. . . . A putative habeas petitioner's mental incompetency . . . renders the petitioner unable to assist his attorney in the preparation of a habeas petition. Such a condition could eviscerate the statutory right to counsel.

Having concluded that a habeas petitioner must be competent to assist counsel, the Ninth Circuit, in *Rohan*, identified a specific example of when competence was required.

> [Gates's] principal contention . . . is that he was incompetent to stand trial and that his trial counsel were constitutionally ineffective for failing to pursue a competency hearing. Like most ineffective assistance of counsel claims, this one depends in large measure on facts outside the record. . . . To prevail, Rohan would likely have to show Gates was incompetent at trial. If Gates were competent today, he could provide information to bolster that claim.

*Id.* at 818 (citations omitted). The Ninth Circuit ruled that appointing a next friend--a

12

person without that same "private knowledge" that Gates had--was an ineffective remedy. Staying the habeas proceedings was the only approach that would safeguard a petitioner's right to be competent.

   **B.   *Rohan*'s Progeny?**

In *Mines v. Dretke*, the Fifth Circuit considered *Rohan* and, for the limited purpose of that appeal, assumed that a right to competency exists during the pendency of a habeas proceeding. 118 Fed. Appx. 806 (5th Cir. 2004). However, the court held that the petitioner failed to make even a minimal showing of incompetency and, as a result, a stay was not appropriate. The court did not explicitly adopt or reject *Rohan* or its reasoning. Clayton asserts that the *Mines* decision "strongly suggests" that it would have adopted *Rohan*'s competency requirement, but that conclusion cannot be drawn from the opinion.

**V.   Is Clayton Competent to Proceed?**

Like the Fifth Circuit, in *Mines v. Dretke*, the Court will assume that a habeas petitioner who seeks review of a death sentence must be able to assist his counsel at some level. However, even if such a right exists, a habeas petitioner need not participate in all, or even most, aspects of the habeas process, because that process is substantially limited by the factual record which was developed at the state level.

In *Patterson v. Illinois*, the Supreme Court noted that the scope of the right to counsel--which is the basis from which any right to competency in a habeas proceeding derives--is defined by "a pragmatic assessment of the usefulness of counsel to the accused at the particular proceeding, and the dangers to the accused of proceeding without

13

counsel." 487 U.S. 285, 298 (1988). In determining the role of counsel, a court's inquiry considers "what purpose a lawyer can serve at the particular stage of the proceedings in question . . . ." *Id.* Thus, "competency is contextual" and a formulation of competency must correspond to the demands placed on a defendant. *Watts*, 87 F.3d at 1288.

Although habeas cases are not purely appellate in nature, they are also not comparable to a trial in which the defense counsel is relying on an accused defendant to present facts that can be organized into a cogent theory of defense. In a habeas proceeding, most, if not all, of the salient facts have been gathered and appear in the records of the underlying state court proceedings. Thus, the Respondent is correct that habeas proceedings place substantially fewer demands on petitioners because the scope of habeas is limited and the petitioner is no longer the primary source of information. *See Wainwright v. Sykes*, 433 U.S. 72, 90 (1977) (the state criminal trial is the "main event" that sets the stage for subsequent habeas proceedings); *O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999) (state court is first forum to review claims and provide relief). This is even more true now that AEDPA has established a presumption that all factual findings actually made in state proceedings are presumed correct.

Given the limited roles of habeas, any right a habeas petitioner has to competency is narrowly circumscribed. If such a right exists, at most, the habeas petitioner must be able to understand the purpose of the habeas proceeding, be able to recall and relate information relevant to a habeas petition and make limited decisions such as filing or dismissing his petition.

14

### A. Clayton's Ability to Understand the Habeas Proceedings

The Forensic Report demonstrates that Clayton is able to understand the proceedings. In her summation, Dr. Preston stated:

> Consistent across all three competency assessment measures, Clayton demonstrated a good factual and rational understanding of the legal system and the process of adjudication. More specifically, during clinical interviews, he demonstrated an adequate rational understanding of the habeas corpus proceedings. He understood the roles of the various individuals involved in this process as well as the possible outcomes. His cognitive deficits did not appear to negatively impact his ability to understand his present legal proceedings.

F.R. at p. 30.

### B. Clayton's Ability to Communicate and to Exercise Judgment About the Choices which are Available to him

#### 1. Test Results and Observations

Clayton's capacity to communicate with his counsel is diminished because of his traumatic brain injury. However, the ECST-R test administrators concluded that "[Clayton] evidenced an adequate overall level of rational understanding, to the extent he was able to reason through alternatives in his case and to sufficiently assist his attorney." F.R. at p. 24. Additionally, the administrators of the ECST-R indicated there was nothing in the test to indicate that Clayton would be unable to recall and relate pertinent information to his counsel. F.R. at p. 24.

Dr. Preston also acknowledged that Clayton is capable of communication with his lawyer, but emphasized that it takes more time and effort than with a fully functioning, client. "[W]ith repeated questioning it is generally possible to obtain accurate factual

15

information from Clayton. . . . [T]his was a time-consuming process which required a great deal of patience and persistence. Detailed knowledge of the topic being discussed was extremely helpful because it facilitated the development of appropriate follow-up questions necessary to obtain the desired information." F.R. at p. 30.

This is similar to the situation in *United States v. Robinson*, 404 F.3d 850 (4th Cir. 2005), where a defendant was found incompetent to stand trial on his drug charges. 253 F.3d 1065. Robinson was hospitalized for four months and enrolled in a special educational program designed to restore competency. At the conclusion of his hospitalization, Robinson was re-evaluated and determined to be competent, even though he still had substantial impairments. This is because the examining physicians found that Robinson's lawyers could compensate for his impairments if they "describe[d] the court proceedings in simple, concrete terms, while avoiding technical descriptions" and they avoided open-ended questions, repeated information, and asked Robinson to repeat the information in his own words. *Robinson*, 253 F.3d at 1068. Finding that Robinson was competent to stand trial, the court noted that he was entitled to "consult with his lawyer with a *reasonable* degree of rational understanding" and that "[a]lthough Robinson's cognitive deficits may have placed additional responsibility on his counsel to ensure Robinson's understanding of the process, it certainly does not establish that he was incompetent to stand trial." *Id.* (emphasis added). Because *Robinson* involved trial competence and even fewer safeguards are necessary in a habeas proceeding, the Court

16

finds that Clayton is capable of relating relevant information to his attorney.[2]

Dr. Preston also concluded that Dr. Backs's earlier diagnosis of dementia was not correct. Dr. Preston did not find Clayton to have any significant impairment in memory. F.R. at pp. 26-28. Clayton consistently was found to be functioning above the level for a mentally retarded person, F.R. at p. 26, and his performance on tests assessing memory, although weak at times, did not suggest severe impairment. F.R. at p. 28.[3]

The record reflects that Clayton's primary impairment relates to his reasoning and decision-making, but the habeas process provides little opportunity for Clayton to make important decisions. For example, Clayton is not afforded the choice between pleading guilty or pursuing a trial; he is not afforded a choice between defense strategies, and he need not decide whether to testify. Nor is there evidence that Clayton cannot make the limited decisions afforded by the habeas process when he is aided by his counsel. For example, Clayton did not need a next friend to decide to file a habeas petition. While Clayton's counsel cites to the American Bar Association's aspirational standards for attorneys who represent habeas petitioners, those standards are not required by law and are not the appropriate measure for determining whether a habeas petitioner is entitled to

---

[2]Clayton's counsel has not represented to the Court that she is unable to obtain factual information from Clayton. Counsel submitted two affidavits in support of Clayton's Motion [Docs. 72 and 93]. Neither of the affidavits state that Clayton is unable to relate information to his counsel. Instead, they state that Clayton gets confused about the litigation, has poor judgment and is unable to exercise independent decision-making.

[3]Dr. Preston also found some inconsistency in his testing that suggested insufficient effort. "Given Mr. Clayton's legal situation . . . exaggeration on some tests in order to appear impaired is not surprising." F.R. at p. 29.

17

a stay.

Although Clayton's judgment is impaired, he has failed to show that the impairment requires a stay of his habeas petition. If Clayton decides that he wants to dismiss his petition, counsel can request a next friend at that time if she believes he is not competent to make that decision.

The Court has found that Clayton is competent to proceed even though Dr. Preston stated: "[I]t is my opinion [Clayton] is likely not competent to proceed." *See* F.R. at p. 23. In the preceding sentence, however, Dr. Preston qualifies her competency determination by stating that Clayton's competency turns on the demands that are placed on him during the habeas proceeding. Because Dr. Preston is not a lawyer, her ultimate conclusion is limited by her lack of information about what Clayton would need to do to assist his attorney in the context of a habeas proceeding. Because Dr. Preston's objective observations and the tests which she reviewed show that Clayton is competent to proceed with his habeas corpus action, the Court is not persuaded by Dr. Preston's ultimate conclusion.

Furthermore, Dr. Preston's conclusion is not binding on the Court because psychological evaluators do not determine competency. Competency is a finding that is reserved for courts. *See United States v. Green*, 544 F.2d 138, 145 (3d Cir. 1976) ("The determination of a defendant's competency to stand trial must be that of the . . . judge."); *Cooper v. United States*, 337 F.2d 538, 539 (D.C. Cir. 1964) ("It is the duty of the district court to make a specific judicial determination of competence . . . rather than accept

18

psychiatric advice as determinative on this issue.") (Wright, J., concurring), *cert. denied*, 382 U.S. 1029 (1966). Competence is a legal conclusion to be resolved by the court. *Lagway v. Dallman*, 806 F. 1322 (N.D. Ohio 1992), *Strickland v. Francis*, 738 F.2d 1542 (11th Cir. 1984). "Even expert opinion on competency rises no higher than the reasons on which it is based . . . ." *Feguer v. United States*, 302 F.2d 214, 236 (8th Cir. 1962).

## VI. Alternative Request for Expert Fees

In the event that the Court denies Clayton's request for stay, he requests the Court to give him funds for his expert to "complete" his evaluation. Clayton has had more than his share of due process on the issue of his competence to pursue habeas relief. He received $7,500 to do a competency evaluation, but his expert claimed that he could not complete his evaluation without an MRI and SPECT study.

Having reviewed Dr. Preston's report, which discusses the MRI and SPECT study done at Dr. Preston's request, it is clear to the Court that neither test was critical. Having medical evidence that explains why a defendant is acting in an incompetent manner may be critical if there is no prior evidence to support a claim of brain damage. However, Clayton's brain injury was well established in the record long before this habeas proceeding. It was discussed at length during trial and in Clayton's Rule 29.15 hearing. Under these circumstances, there was no justification for Clayton's expert to submit nothing of value in exchange for his expert fees. Furthermore, Dr. Preston's report is extraordinarily thorough and no hearing or further evaluation is needed.

## VII. Order

19

Accordingly, it is hereby

ORDERED that Clayton's Renewed Motion for Stay of Proceedings [Doc. # 93] is DENIED.

                                                                 s/ Nanette K. Laughrey
                                                                     NANETTE K. LAUGHREY
                                                                     United States District Judge

DATE: April 27, 2006
Kansas City, Missouri