# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

CECIL CLAYTON,                    )
                                  )
            Petitioner,           )
                                  )
      v.                          )        Case No. 02-MC-8001-CV-W-NKL
                                  )        CAPITAL CASE
AL LUEBBERS,                      )
Supt., Potosi Correctional Center )
                                  )
            Respondent.           )

## ORDER

Pending before the Court is Cecil Clayton's ("Clayton") Petition for a Writ of

Habeas Corpus Pursuant to 28 U.S.C. § 2254 [Doc. # 46]. The Court denies Clayton's

Petition.

## I.    Factual Background

### A.    Clayton's Pre-Offense Background

As a young man, Clayton had "a violent, quick temper and had several run-ins

with the law." *Clayton v. State*, 63 S.W.3d 201, 205 (Mo. 2001). During the 1960s, he

underwent a religious conversion after which he stopped drinking alcohol and began to

attend church regularly. Clayton also began preaching and singing at religious worship

services.

In 1972, Clayton suffered a traumatic head injury while working at a sawmill. A

piece of wood broke off a log he was working on and became embedded in his head.

1

Clayton underwent surgery to remove the wood from his head and, during the extraction

process, surgeons had to remove approximately eight percent of Clayton's brain.

After his head injury, Clayton tried other types of work and briefly worked as a

police officer for a small municipality in Missouri. Eventually, Clayton discontinued full

time employment and received social security disability benefits. He continued to do

various odd jobs.

Clayton's personal life took a downturn after his head injury. He stopped

preaching and evangelizing and he resumed drinking alcohol. He and his wife divorced

and he became increasingly violent and agitated with members of his extended family.

### B. The Offense

In November of 1996, Cecil Clayton and Martha Ball ("Ball") were romantically

involved, but the relationship was ending. On November 26, 1996, they agreed to meet at

the Country Corner, a store in Purdy, Missouri, so that Clayton could return some papers

Ball had left at his house. Clayton arrived at the store without the papers. Clayton

requested that Ball go with him to his home to get the papers but she refused. He left and

returned with the papers.

When Clayton returned with the papers, he and Ball began to argue in the store.

The clerk, Barbara Starkey, called the police. Officer Jim McCracken, the Chief of Police

in Purdy, responded to the call. Clayton left the store after Chief McCracken arrived.

Ball was staying with her mother, Dixie Seal ("Seal"), in Cassville and she asked Chief

McCracken if he would escort her there. However, before the escort was arranged, Ball

left the store to go to Vicky Deeter's ("Deeter") home in Monett.

At around 9:50 p.m., Ball's sister, Carolyn Leonard ("Leonard"), noticed a truck at the end of Seal's driveway. She believed the truck belonged to Clayton and she called the police.

Deputy Christopher Castetter ("Castetter") arrived at Seal's home at 10:03 p.m. When Castetter did not respond to calls from the dispatcher, David Bowman ("Bowman") and Jason Manning ("Manning"), who were fellow officers with Castetter, went to the scene. They found Castetter in his police car slumped over in his seat. Castetter's weapon was still snapped in its holster. Manning attempted to assist Castetter who was bleeding heavily from his head and having trouble breathing. Bowman contacted the dispatcher at 10:07 p.m. for an ambulance. Later that night, Castetter died from a single gunshot to the head.

Bowman then contacted Seal and Leonard to obtain a description of the truck that was in the driveway. Bowman contacted the dispatcher and described the truck. Chief McCracken heard the description of the vehicle. He recognized the truck as the same vehicle that Clayton had been driving earlier at the Country Corner store. Chief McCracken met another law enforcement official from a neighboring jurisdiction and they went to Clayton's residence.

Around 10:15 p.m., Clayton arrived at Martin Cole's ("Cole") home. They drove together in Clayton's truck to Clayton's home. According to Cole, Clayton said that he had shot a police officer in the head and displayed a gun to Cole. Clayton asked Cole to

3

tell the police that he and Clayton were together all evening watching television.

Clayton and the police arrived at his home at about the same time. Chief McCracken saw Clayton get out of his truck. McCracken tried to engage Clayton in conversation, but he refused to come near the officer, professing that he could not hear Chief McCracken. Clayton kept his right hand in his pocket. Clayton walked toward the side of his house to a pile of concrete blocks, removed something from his pocket, and bent over. Clayton then returned to his truck. The police arrested Clayton and impounded his truck. Chief McCracken examined the block pile and found a .38 caliber gun, which contained four live rounds and one expended cartridge. Later testing could neither confirm nor rule out that the bullet recovered from Castetter's body was fired from the gun.

Later that night, Clayton was questioned about Castetter's murder. When confronted with evidence that Clayton had been at the scene of the murder, Clayton responded, "He probably should have just stayed home. . . . He shouldn't have smarted off to me. . . . But I don't know because I wasn't out there."

The police obtained paint transfer samples from Castetter's patrol car and from Clayton's truck. The samples from Clayton's truck were of similar color and chemical composition to the paint transfers from the patrol car. A piece of black molded plastic found at the crime scene fit perfectly into a damaged area of the tail-light of Clayton's truck. Clayton and Cole submitted to gunshot residue tests. Clayton's test was negative, but Cole's test was consistent with having fired a weapon.

4

Clayton was incarcerated in the Lawrence County Jail and shared a cell with William Rogers ("Rogers") and Robert Compton ("Compton"). According to these jailhouse informants, Clayton told them that he had shot a police officer.

### C.     State Court Proceedings

#### 1.     Pretrial Period

Clayton retained Attorney Ross Rhoades ("Rhoades"), who was assisted by his daughter, Christine. Before the trial, Rhoades hired Patrick Berrigan ("Berrigan") to consult on the case and help Rhoades with voir dire. Since 1990, Berrigan worked exclusively on capital cases and represented over fifty capital defendants. To help prepare Rhoades for voir dire, Berrigan reviewed all of the police reports concerning the case. After Berrigan reviewed the police reports, he discussed the case with Ross and Christine Rhoades. In the guilt phase, Rhoades wanted to assert that Clayton was not guilty, because there was no gunshot residue on Clayton's hands, but there was gunshot residue on Cole's hands. In the penalty phase, Rhoades intended to base his mitigation theory on Clayton's brain damage that he suffered after a 1972 sawmill accident.

Berrigan vehemently advised Rhoades to abandon the not guilty theory and present a guilt phase defense of diminished capacity. In Berrigan's opinion, diminished capacity was the only viable defense. Berrigan advised Rhoades to abandon the not guilty theory, because the evidence was "fairly overwhelming" that Clayton was the shooter, and because it is "a disaster" to present a guilt phase defense that is inconsistent with the mitigation theory, because the defense will have no credibility with the jury.

5

2. *Trial*

a. **Guilt Phase**

Through his cross-examination of the State's witnesses, Rhoades emphasized the lack of evidence of guilt. From Bowman, one of the first officers to arrive at the scene, he elicited testimony that Leonard, Martha Ball's sister, did not tell Bowman that she saw Clayton on the night of the shooting. Rhoades elicited testimony from Leonard that she did not like Clayton and did not want him to have a relationship with her sister. Rhoades also elicited testimony that the officer who arrested Clayton did not see what, if anything, Clayton removed from his pocket while standing beside the cement blocks; he saw no gun in Clayton's possession. On cross-examination of the State's ballistics expert, Rhoades emphasized that it was impossible to determine whether the bullet recovered from Castetter was fired from the gun recovered at Clayton's home, and that the land width measurements of the recovered bullet did not correspond to the measurement of bullets test fired from Clayton's gun. On cross-examination of the State's trace evidence expert, Rhoades emphasized that a paint match is not conclusive. Mr. Rhoades also elicited testimony that Clayton did not have gunshot residue on his hands or clothing, but that Cole, who is left-handed, had gunshot residue on his left hand.

The State presented the testimony of two jailhouse informants, Rogers and Compton. They testified that Clayton had admitted to them while incarcerated that he had shot a police officer. They further testified that Clayton told them he could not tolerate law enforcement officers and that they all deserved to be shot.

6

In the defense's case-in-chief, Rhoades called Clayton's brother, Marvin, to describe the sawmill accident that caused Clayton's brain injury. Dr. Bettye Back, one of Clayton's experts who testified at trial, described his brain injury in detail and testified that Clayton's brain damage made him incapable of deliberating. In closing argument, the prosecutor said Dr. Back's testimony was "preposterous," "voodoo," and an "excuse."

In the defense's closing argument, Rhoades first argued that Mr. Clayton was brain damaged and was incapable of deliberation. Rhoades then argued that what happened was a "mystery" or "puzzle," and there was reasonable doubt as to Mr. Clayton's guilt. Rhoades suggested that Clayton may have been at the crime scene, he may have been with someone else, or he may not have been there at all.

In rebuttal, the prosecutor criticized the defense for suggesting that Cole was the shooter and for being inconsistent. The prosecutor pointed out that Mr. Cole could not have been the shooter, because he had an alibi. The jury found Clayton guilty of first-degree murder.

### b. Penalty Phase

During the penalty phase, the State presented evidence that Clayton was on probation for assault at the time of Castetter's death and had a reputation for violence in the community. Evidence concerning Clayton's prior assault convictions was admitted, including a large photograph of one of the assault victims, covered with blood. On cross-examination, the defense developed evidence that while on probation, Mr. Clayton paid his court-ordered restitution, attended Alcoholics Anonymous meetings and,

7

as a result of his good adjustment, was placed on mail-in supervision.

The defense also presented evidence that the injuries to the assault victim in the picture were minor, that Mr. Clayton had adjusted well to the Jasper County Jail, including his participation in jail religious services. Clayton's brother, Jerry, testified about his brother's work as a minister, and about the change in his personality that occurred after his head injury. After further instruction and deliberation, the jury imposed the death penalty.

## II.    Procedural Background

On June 29, 1999, the Missouri Supreme Court affirmed Mr. Clayton's conviction and sentence. *State v. Clayton*, 995 S.W.2d 468 (Mo. 1999). Clayton filed a timely petition for writ of certiorari to the United States Supreme Court. Certiorari was denied on November 29, 1999. *Clayton v. Missouri*, 528 U.S. 1027 (1999).

Clayton filed a timely motion for post-conviction relief pursuant to Mo. Sup. Ct. R. 29.15. An evidentiary hearing was held in the trial court. The trial court denied relief on Clayton's post-conviction motion and the Missouri Supreme Court affirmed on December 4, 2001. *Clayton v. State*, 63 S.W.3d 201 (Mo. 2001). Rehearing was denied on January 22, 2002. A timely petition for writ of certiorari to the United States Supreme Court was denied on June 3, 2002. *Clayton v. State*, 535 U.S. 1118 (2002).

After filing his pending Petition for habeas relief in this Court, Clayton moved to stay these proceedings based on his lack of competence. The Court has denied Clayton's Motion, finding that Clayton is competent to pursue his habeas Petition. *See* Order [Doc.

# 104].

## III.    Standard of Review

State prisoners who believe that they are incarcerated in violation of the Constitution or laws of the United States may file a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Before doing so, petitioners must exhaust their state remedies.  *See Coleman v. Thompson*, 501 U.S. 722, 732 (1991).

Section 2254 has been amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132 (Apr. 24, 1996).  Under AEDPA, federal courts considering habeas petitions must "exercise only limited and deferential review of underlying state court decisions."  *See Lomholt v. Iowa*, 327 F.3d 748, 751 (8th Cir. 2003).  Specifically, AEDPA mandates that a federal court may not grant a writ of habeas corpus unless the state court's decision (1) was "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," (2) "involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States," or (3) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  *Id.* at 752.

A state court decision is "contrary to" clearly established Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the] Supreme Court on a question of law or . . . decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor,* 529 U.S. 362 (2000).

A state court decision involves an unreasonable application of clearly established

9

Supreme Court precedent "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* "'An *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Carter v. Bowersox*, 265 F.3d 705, 713 (8th Cir. 2001) (quoting *Williams*, 529 U.S. at 410). "Thus, 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" *Id.* (quoting *Williams*, 529 U.S. at 411). A state decision also represents an unreasonable application of federal law if it "'unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" *Moore v. Purkett*, 275 F.3d 685, 688 (8th Cir. 2001) (quoting *Williams*, 529 U.S at 362).

Finally, a state court decision involves "an unreasonable determination of the facts in light of the evidence presented in state court proceedings . . . only if it is shown by clear and convincing evidence that the state court's presumptively correct factual findings do not enjoy support in the record." *Whitehead v. Dormire*, 340 F.3d 532, 536 (8th Cir. 2003); *see also Kenley v. Bowersox*, 275 F.3d 709, 711-12 (8th Cir. 2002) (the state court's "factual findings carry a presumption of correctness that will be rebutted only by clear and convincing evidence.").

## IV. Discussion

## A.    Claim 1: Ineffective Assistance of Counsel for Presenting Alternative Theories of Defense at Trial

Clayton alleges that Rhoades provided ineffective assistance during his trial because Rhoades presented alternative theories of defense.  During the trial, Rhoades argued that Clayton did not shoot Castetter, but he also argued that, even if Clayton had shot Castetter, Clayton had diminished capacity because of his mental impairments. Clayton argues it was ineffective assistance of counsel for Rhoades to present alternative theories of defense.

To establish ineffective assistance of counsel, a movant must satisfy a two-part test.  First, the movant must prove that his counsel's representation was deficient, and second, that the deficient performance prejudiced his case.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  A counsel's performance is deficient if he or she "failed to exercise the customary skills and diligence that a reasonably competent attorney would have exhibited under similar circumstances."  *United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996) (internal quotation omitted).

The prejudice component "focuses on the question [of] whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair."  *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).  "Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him."  *Id.*  Further, "[w]hen considering whether the defense suffered prejudice, [the] court must determine whether

11

there is a reasonable probability (sufficient to undermine confidence in the outcome) that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Blankenship v. United States*, 159 F.3d 336, 338 (8th Cir. 1998) (internal quotation omitted).

Counsel's "'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Johnston v. Luebbers*, 288 F.3d 1048, 1055 (8th Cir. 2002) (quoting *Strickland*, 466 U.S. at 690-91). Trial counsel's judgment is entitled to substantial deference. *Bucklew v. Luebbers*, 436 F.3d 1010, 1016 (8th Cir. 2006).

Clayton's allegation concerning his counsel's incompetence was raised in his Rule 29.15 Motion and reviewed by the Missouri Supreme Court on appeal. *Clayton*, 63 S.W.3d at 206. The Missouri Supreme Court rejected Clayton's contention that Rhoades's presentation of alternative theories of defense rose to the level of ineffective assistance.

The Missouri Supreme Court stated: "Proof that an individual does not have the capacity to form intent does not negate an alibi defense. The facts underling [sic] both defenses can exist simultaneously." *Id.* (citing *State v. Lora*, 305 S.W.2d 452, 455-56 (Mo. 1957)). Discussing Clayton's specific case, the court stated,

It is not logically inconsistent to argue that the state failed to prove that

12

Clayton was the shooter and that he did not have the mental capacity necessary to form intent for first-degree murder. Both can be equally true and exist at the same moment in time. While pursuing both defenses in one trial might hurt an attorney's credibility with the jury in some cases, there is no *per se* rule against an attorney arguing both that the state must prove guilt beyond a reasonable doubt and asserting a diminished capacity defense. The decision to use two defenses turns solely on a question of trial strategy.

*Id.* at 206-07. The court further concluded that Rhoades's choice was reasonable in Clayton's case because he did not have a good defense under either theory. *Id.* The court also pointed to Rhoades's thorough preparation for the trial--including the use of a mock jury that did not reject his use of alternative theories of defense--as further evidence that his trial strategy was reasonable. *Id.*

In support of his contention that Rhoades's assistance was ineffective, Clayton points to the fact that Berrigan advised Rhoades to abandon his argument that Clayton did not commit the crime and instead focus on Clayton's diminished capacity. Clayton also points to the State's attack on Rhoades's approach during its closing argument and identifies a letter that Rhoades sent to Berrigan wherein he conceded that he should not have pursued the alternative theories. According to Clayton, Rhoades wrote, "It was not until the trial had been completed and some days had passed before I fully realized how inadequate and inept I was in attempting to spare [Clayton] from the death penalty. As you pointed out to me, but I was unwilling to listen, our chances of succeeding in the first phase were minimal." The letter was presented as an exhibit during Clayton's post-conviction hearing. *See* Clayton Ex. G at p. 974.

Rhoades's letter is not determinative of whether his conduct fell below the standard for reasonable counsel.  *See United States v. Eyman*, 313 F.3d 741, 743 (2nd Cir. 2002) ("It is the magnitude of those errors that is determinative; trial counsel's admission that his performance was deficient is not dispositive."); *Chandler v. United States*, 218 F.3d 1305, 1316 n. 16 (11th Cir. 2000) ("Because the standard is . . . objective . . . , that trial counsel admits that his performance was deficient matters little.") (citing *Tarver v. Hopper*, 169 F.3d 710, 716 (11th Cir. 1999)).

Moreover, there is evidence that Rhoades's letter was the product of his remorse at the trial's outcome rather than his belief about his competency as Clayton's counsel. Rhoades later admitted during the post-conviction proceeding that he "absolutely" felt "bad and upset" after Clayton was found guilty.  *Id.* at p. 975.  He did not concede that he believed his representation was ineffective and he merely stated, "I would hope that that is not the case."  *Id.*  He also testified that he did not believe at the time of the trial that his representation was ineffective.  *Id.* at p. 976.  Thus, Rhoades's letter to Berrigan does not establish that his counsel was ineffective.

Clayton has failed to demonstrate that the Missouri Supreme Court's determination was "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States."  *Lomholt*, 327 F.3d at 752.  To the contrary, federal courts have found that arguing alternative theories of defense is not unreasonable.  *See Singleton v. Lockhart*, 871 F.2d 1395 (8th Cir. 1989) (counsel in capital case not ineffective for arguing factual innocence and the applicability of a lesser-included offense); *Hunt v.*

14

*Nuth*, 57 F.3d 1327 (4th Cir. 1995) (counsel in capital case not ineffective for arguing both factual innocence and lack of deliberation due to intoxication); and *Brown v. Dixon*, 891 F.2d 490 (4th Cir. 1989) (counsel not ineffective in capital case for asserting petitioner's drunkenness and factual innocence as alternative theories for acquittal).

In *Singleton*, the Eighth Circuit stated, "There is nothing unusual about arguing inconsistent or alternative theories of defense." *Singleton*, 871 F.2d at 1400. The court noted that, given that the petitioner was facing the death penalty, "gambling on an all-or-nothing defense could well have been less reasonable than arguing a fallback position in addition to a claim of total innocence." *Id.*

Clayton has also failed to demonstrate that the Missouri Supreme Court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* Clayton asserts that his mental impairments created a better case for his diminished capacity defense and that the Missouri court erred when it stated that Clayton's argument was weak under either theory, but there is ample evidence to support the Missouri Supreme Court's contrary conclusion. The Court denies Clayton's first claim for relief.

### B. Claim 2: Ineffective Assistance of Counsel for Failure to Adequately Investigate and Present Diminished Capacity Defense at Trial

Clayton states that Rhoades was ineffective for failing to adequately develop the defense of diminished capacity, even though Rhoades retained an expert to explain his brain injury and testify that Clayton could not deliberate. Specifically, Clayton argues

15

that Rhoades was ineffective for not introducing records from the Nevada State hospital,

his Social Security file, and his school records. Clayton also argues that Rhoades was

ineffective for not presenting the testimony of Carolyn Dorsey ("Dorsey"), Arnold Evans

("Evans"), and Leslie Paul ("Paul") so they could testify about how Clayton's behavior

dramatically changed after the 1972 sawmill accident.

### 1. Records

The Missouri Supreme Court held that Rhoades did not render ineffective

assistance of counsel by failing to introduce the voluminous records now identified by

Clayton. The court stated:

> Clayton's attorney also had legitimate strategic reasons for not introducing
> Clayton's school records, Nevada State Hospital records, and Social
> Security Disability file, as Clayton now claims a reasonable attorney would
> have done . . . . [Rhoades] knew that while the records might give the jury
> insight into [Clayton's] history, their introduction also ran the risk of the
> defense getting mired in a "paper war" with the prosecution, deluging the
> jury with hundreds of pages of documents and confusing them. Clayton's
> attorney wanted to keep the picture he painted for the jury simple; that of a
> man forever changed by a sawmill accident in 1972. The records Clayton
> now complains about would have complicated that picture and shown the
> jury that Clayton was also a violent man with a criminal record even before
> his accident occurred. Also, some of the evidence cast a cloud of doubt
> over claims about Clayton's mental incapacity. Thus, the attorney's
> decision was consistent with his trial strategy and was not ineffective
> assistance.

*Clayton*, 63 S.W.3d at 208.

The Nevada State Hospital records, which date from 1974 (two years after

Clayton's sawmill accident), reflect that Clayton "had a high temper and was very high-

strung even back in his teens, when he was always getting into fights." *See* Resp. Ex. K

at p. 12.  The records also state that "[e]ven before the accident people were inclined to irritate him and he didn't like to be in crowds."  *Id.* at p. 9.  They also state that Clayton had a "bad reputation for drinking and getting into fights" before his marriage.  *Id.*

Clayton contends that the foregoing is but a minor snapshot from the records and it was ineffective assistance for Rhoades not to present the records in their entirety. Clayton points to specific comments that reference Clayton's inability to work "without getting upset" and the doctor's conclusion that Clayton "may find himself expending a great deal of emotional energy trying to control himself."  *Id.* at pp. 6, 9.  Clayton also asserts the records contain evidence of head injuries that pre-dated his 1972 sawmill accident, including being dropped on the head when he was an infant and an automobile accident.

At best, the records identified by Clayton are contradictory about the status of Clayton's mental capacity.  While some comments lend credence to Clayton's argument, the records do not overwhelmingly demonstrate that Clayton lacked the capacity to deliberate when he shot Castetter, and there is evidence in them that would be detrimental to Clayton's defense.  Thus, Clayton has failed to demonstrate that it was unreasonable for the Missouri Supreme Court to determine that the records would not have been of substantial help to Clayton.

Similarly, it was not unreasonable for the Missouri Supreme Court to find  that Rhoades's failure to introduce Clayton's Social Security Disability file was ineffective assistance of counsel.  Both parties cite extensive evidence from the voluminous Social

Security Disability file, which contains conflicting evidence about Clayton's mental capacity to engage in employment. Clayton concedes the records are "voluminous" (*see* Traverse [Doc. # 65] at p. 17, n. 5), which supports Rhoades's reason for excluding them because they might confuse the jury. Also, the records contain notations from Clayton's physicians undermining his claim of mental impairments. Moreover, the records proffered by Clayton focus on his ability to work, making them only marginally relevant to his claim of mental incapacity.

Finally, Clayton contends that Rhoades should have introduced his school records to present a clearer picture of his mental challenges. Clayton asserts that the records would have demonstrated to the jury the "before and after" effect of the 1972 sawmill accident because they would have shown that Clayton previously had better mental capacity. However, Clayton's brother, Martin Clayton, testified that Clayton was a good student and that he was "fairly smart." *See* Resp. Ex. A-10 at p. 1518:21-22. Thus, the fact that Clayton was a good student before the accident was admitted into evidence and the failure to present cumulative evidence cannot constitute ineffective assistance of counsel. *See Hall v. Luebbers*, 296 F.3d 685, 693 (8th Cir. 2002) ("We conclude that failure to present cumulative evidence is neither contrary to nor an unreasonable application of the governing principles found in *Strickland*."); *Henderson v. Norris*, 118 F.3d 1283, 1288 (8th Cir. 1997) ("Counsel's failure to proffer evidence that was both inadmissible and cumulative does not constitute ineffective assistance.").

Finally, counsel's "[decision] to introduce only some of the available evidence on

a point [does] not, unless 'deficient in some significant respect,' fail the first *Strickland*

prong." *Fretwell*, 133 F.3d at 628 (quoting *Smith v. Armontrout*, 888 F.2d 530, 535 (8th

Cir. 1989)).

### 2. Witnesses

Clayton also argues that Rhoades provided ineffective assistance when he failed to

present the testimony of Dorsey, Evans, and Paul to support Clayton's diminished

capacity defense.

### a. Arnold Evans

According to Clayton, "Arnold Evans, a minister, could have been called at the

guilt phase to testify concerning the changes he saw in Mr. Clayton after the 1972 injury.

This testimony would have had the added benefit of placing evidence of Mr. Clayton's

prior good works before the jury at the guilt phase." *See* Traverse [Doc. # 65] at p. 22.

In his Rule 29.15 Motion, Clayton identified Evans as a witness who could have

presented mitigating evidence during the penalty phase. He never references Evans as a

witness during the guilt phase of the trial, and the Missouri Supreme Court's Order

affirming the denial of Clayton's Rule 29.15 Motion only addresses Evans as a mitigation

witness.

To the extent that Clayton now wants this Court to consider Evans as a diminished

capacity witness during the guilt phase, that claim is barred because it was never

presented to the Missouri courts for consideration. *See Reese v. Delo*, 94 F.3d 1177,

1181-82 (8th Cir. 1996) (en banc) (claim not properly preserved at state level is barred

19

from federal habeas review) (citation omitted).

###### b.    Leslie Paul

Paul is a minister who worked with Clayton and Clayton states that he could have offered testimony about Clayton's diminished capacity and his religious faith.  The Missouri Supreme Court found that Rhoades's failure to call Paul as a witness was not ineffective assistance because:

> When the attorney contacted Paul prior to trial about testifying about Clayton's good traits, Paul told him that he "couldn't help him." . . .  Here, Paul's statement gave the attorney reason to believe that he did not want to testify and that he might offer testimony harmful to Clayton's case.  The fact that Paul now claims he only told Clayton's attorney he could not help him because he distrusted the attorney is immaterial.  At the time the attorney made the decision not to call him, he was acting reasonably based on Paul's statements to him.  An attorney is not required to be omniscient and see the true reasons why a witness does not want to talk to him or testify.

*Clayton*, 63 S.W.3d at 208.  Clayton concedes that Rhoades contacted Paul and Paul told Rhoades he could not help him, but Clayton states that it was because Paul had a hearing difficulty and he "ha[d] a bad impression of trial counsel."  *See* Traverse [Doc. # 65] at p. 20.  Clayton further states, "[w]hile trial counsel is not required to be omniscient, he is required to have sufficient common sense to make arrangements for a face-to-face meeting with a potential witness who has a hearing problem.  Trial counsel's failure to do this was not reasonably effective assistance of counsel."  *Id.*

The undisputed evidence is that Rhoades contacted Paul and Paul said "he couldn't help [Clayton]."  There is no evidence that Rhoades knew that Paul had a hearing

problem and Paul didn't indicate he was having problems hearing during the conversation. Clayton has failed to show that the Missouri Supreme Court was unreasonable when it found that Rhoades was not ineffective for failing to call Paul as a witness.

### c. Carolyn Dorsey

Dorsey is Clayton's sister. Regarding Dorsey's testimony about Clayton's diminished capacity during the guilt phase, the Missouri Supreme Court stated:

> While Dorsey could have testified about the change in Clayton's personality afer the sawmill accident, the attorney presented other witness [sic] who testified about the same thing. . . . Also, Dorsey would have provided the prosecution on cross-examination with the opportunity to show that Clayton had a violent temper even before his accident, undercutting Clayton's diminished capacity defense.

*Clayton*, 63 S.W.3d at 209.

Clayton takes issue with the Missouri Supreme Court's conclusion that Dorsey's testimony would be cumulative. "Dorsey's testimony concerning specific instances of Mr. Clayton's conduct which illustrated the changes in Mr. Clayton's behavior over the years was not duplicated by Marvin Clayton or by any other witness." *See* Traverse [Doc. # 65] at p. 21. Clayton does not cite to any specific example nor does he outline what Dorsey's testimony would have been.

Absent some evidence that Dorsey's testimony was not cumulative, the Court cannot find that the Missouri Supreme Court's holding is an "unreasonable determination" of the facts, because counsel's failure to present cumulative evidence does

not support an ineffective assistance of counsel claim. *See Hall*, 296 F.3d at 693;

*Henderson*, 118 F.3d at 1288.

In addition, the Missouri Supreme Court found that if Dorsey were called as a

witness, she would have to reveal on cross examination that Clayton assaulted his high

school principal in 1968 and went to jail, thereby undermining his defense that his violent

predilections began after the sawmill accident in 1972. If Rhoades had permitted this

evidence in, it is likely that Clayton would be claiming that Rhoades rendered ineffective

assistance of counsel by calling Dorsey to the stand. The Missouri Supreme Court's

conclusion on this issue is clearly reasonable.

In support of his claim, Clayton cites *Brown v. Sternes*, 304 F.3d 677 (7th Cir.

2002), for the proposition that trial counsel is ineffective when counsel decides to pursue

a defense based on mental capacity but then fails to perform an adequate investigation.

Clayton, however, ignores that Rhoades did perform an adequate investigation--he

contacted Paul who indicated he did not want to help and he contacted Dorsey, but opted

not to call her as a witness because of the harmful evidence she would have to reveal.

Rhoades cannot be found ineffective for this trial strategy. *Graham v. Dormire*, 212 F.3d,

437, 440 (8th Cir. 2000).

The Missouri Supreme Court evaluated Clayton's second claim in its entirety and

determined that it lacked merit. This Court cannot reject that determination without some

evidence that the court's presumptively correct factual determinations "do not enjoy

support in the record." *Whitehead*, 340 F.3d at 536. Clayton has not made such a

22

showing and his second claim for relief is denied in its entirety.

    **C.**     **Claim 3: Ineffective Assistance of Counsel for Failure to Assess Clayton's Competency to Stand Trial**

    Clayton asserts that Rhoades provided ineffective assistance of counsel when he failed to have Clayton's competency assessed. On this issue, the Missouri Supreme Court stated:

> Clayton's attorney was not ineffective for failing to adjudicate his competency. Counsel has no duty to investigate a client's mental condition where the client appears to have the present ability to consult rationally with the attorney and understand the court proceedings. In this case, Clayton's attorney had extensive prior involvement with him before this case ever arose. From the fact that Clayton was able to intelligently discuss his legal options with his attorney, and even carry on correspondence with him about the case, the attorney could reasonably conclude that he was competent to stand trial.

*Clayton*, 63 S.W.3d at 209.

    Clayton argues the Missouri Supreme Court's determination is not reasonable because Jeff Tichenor ("Tichenor"), a physician's assistant who treated Clayton from January through March 1997, advised Rhoades to obtain a psychiatric evaluation for Clayton. Tichenor testified during the post-conviction hearing that he told Rhoades about Clayton's symptoms, including poor hygiene, agitation, and reports of Clayton smearing feces on the wall of his cell. *See* Resp. Ex. G-4 at pp. 521 and 529. Rhoades allegedly told Tichenor that another inmate had contacted him and told him that Clayton was sleeping all day and he was heavily sedated. *Id.* After this was brought to Tichenor's attention, he discovered that Clayton's medication dosage had been doubled and he was

receiving sixteen milligrams per day of Ativan, rather than the prescribed eight milligrams. *Id.* at p. 530. On cross-examination, Tichenor admitted that he was not certified under Missouri law to conduct a psychiatric evaluation, he is not a medical doctor, and he has no specialized psychological training. *Id.* at pp. 532-33.

Respondent argues that the Missouri Supreme Court's determination is not unreasonable because all other signs pointed to Clayton being competent for trial. Rhoades retained Dr. Bettye Back to conduct a neuropsychological evaluation of Clayton in June 1997--after Tichenor's treatment of Clayton. *See* Resp. Ex. I at p. 3. Dr. Back is a clinical psychologist with a specialty in neuropsychology. *Id.* Although she was not retained specifically to evaluate Clayton's competency, Dr. Back stated that she believed in June 1997 that Clayton was competent to stand trial and that, had she thought otherwise, she would have told Rhoades he was not competent. *See* Resp. Ex. I-1 at pp. 77-78. According to Rhoades's testimony, he asked Dr. Back to let him know if there was a problem with Clayton's competency. *See* Resp. Ex. G-6 at pp. 891, 967.

Similarly, Clayton's first attorney was Berrigan who, at the time, worked in the Capital Litigation Unit of the Missouri Public Defender's Office. Berrigan was initially assigned to Clayton's case until Clayton opted to retain Rhoades for his trial. *See* Resp. Ex. G at p. 635. Berrigan met with Clayton after he was arraigned. According to Berrigan, Clayton was able to provide him information and communicate with him about his family. *Id.* at p. 681. Clayton also expressed an interest in switching judges. *Id.* at p. 678. Later in the interview, Clayton, himself, asked about obtaining a mental evaluation.

24

*Id.* at p. 683.

Rhoades had previously represented Clayton in a 1992 assault case and Clayton showed no signs of incompetence during that proceeding. *See* Resp. Ex. G-6 at p. 929. Rhoades testified that in 1997 Clayton did not manifest anxiousness and that he had "no more than average" problems with his memory. *Id.* at p. 896. Rhoades also testified that in preparing for trial, he would discuss case alternatives with Clayton and Clayton would ask him questions about them. *Id.* at p. 897. Rhoades and Clayton discussed whether Clayton wanted to pursue a mental health defense and whether to seek a change of venue. *See* Resp. Ex. G-6 at pp. 897, 935. After discussing possible venues, Clayton and Rhoades agreed that Jasper County would be an acceptable venue. *Id.* at 936. Rhoades also testified that he would send materials to Clayton regarding the facts of the case and they would review them together with Rhoades asking him questions; Rhoades later testified that Clayton "answered every question I asked him." *Id.* at pp. 939, 943. Ultimately, Rhoades testified that there were no indicators to suggest that Clayton did not understand the charges against him or that he was unable to assist Rhoades. *Id.* at 939.

The testimony of Christine Rhoades, who served as co-counsel in the case, supports the testimony of Ross Rhoades. She testified that Clayton provided input during the trial about witnesses, both before and after they testified. *See* Resp. Ex. G-5 at 815. She also observed Clayton and her father discuss whether he should testify during the suppression hearing. *Id.* at p. 815-16.

The only evidence supporting Clayton's claim that Rhoades's conduct fell below

25

an acceptable standard of care is Tichenor's statement in early 1997 to Rhoades that Clayton should receive a psychological evaluation. However, the undisputed evidence reveals that Rhoades adhered to Tichenor's advice when he retained Dr. Back to evaluate Clayton in June 1997. Having received Dr. Back's report about Clayton, with no indication that he was incompetent to proceed, Rhoades opted not to further explore the issue. Given that Dr. Back is a clinical psychologist with a specialty in neuropsychology, while Tichenor is a physician's assistant with no special training in psychology, Rhoades's decision to give more weight to Dr. Back's opinion is not unreasonable; particularly, where Rhoades was interacting with Clayton and Rhoades did not perceive that Clayton was incompetent to stand trial.

Even assuming Clayton can establish that Rhoades's conduct fell below a reasonable standard, he has not satisfied the prejudice prong of the *Strickland* analysis because he has not showed that Clayton was actually incompetent to stand trial. He points to the testimony of Dr. Foster as evidence of incompetency, but the state courts rejected that contention. The Court must "presume the state court's finding of competence is correct." *Lyons v. Luebbers*, 403 F.3d 585, 593 (8th Cir. 2005) (citing *Boyd v. Delo*, 999 F.2d 1286, 1289 (8th Cir. 1993); *Reynolds v. Norris*, 86 F.3d 796, 800 (8th Cir. 1996)).

The Missouri Supreme Court held that:

Clayton has also failed to demonstrate that he was actually incompetent during his trial. The trial court did not find Dr. Daniel Foster, the only expert to testify that Clayton was incompetent, credible. . . . In this case, Dr.

26

Foster's determination is especially questionable because even though he said Clayton was incompetent at the time of his trial, he admitted that Clayton understood the role of the prosecutor, the judge, the juror, and even his own attorney in the process. He further stated that Clayton knew what he was charged with, that he was facing the death penalty, and that he was able to discuss various options with his attorney. Dr. Foster's testimony is further undermined by the fact he examined Clayton for the first time years after the original trial occurred.

*Clayton*, 63 S.W.3d at 209. The Missouri Supreme Court accurately characterized Dr. Foster's testimony. Dr. Foster examined Clayton three years after his crime, which he conceded was unusual. *See* Resp. Ex. G-3 at pp. 420-22. Dr. Foster testified that Clayton understood the proceedings, the charges against him and that he faced the death penalty, that he had the right not to testify, and the role of different participants in the trial, including his attorneys, the prosecutor, the judge, and the jury. *Id.* at pp. 423; 454-56. Dr. Foster also testified that Clayton was cooperative with his attorneys and he followed their advice, but he worried that Clayton was too dependent on his counsel and that was the basis of his determination that Clayton was not competent to stand trial. *Id.* at p. 457. However, he also said that Clayton had a "fine relationship" with Rhoades. *Id.*

The Missouri courts' decision to give no weight to Dr. Foster's testimony is well supported by the evidence in the record, and Clayton's third claim is denied.

### D. Claim 4: Ineffective Assistance of Counsel for Failure to Present Insanity Defense at Trial

Clayton asserts that his trial counsel provided ineffective assistance when he failed to present an insanity defense during the trial. Missouri law authorizes the use of an insanity defense in Mo. Rev. Stat. § 552.030(1), which provides that a defendant is not

27

criminally responsible if the defendant was "incapable of knowing and appreciating the nature, quality or wrongfulness of the conduct" at issue.

Clayton's fourth ground for relief is procedurally barred because he failed to raise it in either his Rule 29.15 proceeding or on appeal from the Rule 29.15 court. Therefore, this Court may review the claim only if Clayton can show cause for his procedural default and actual prejudice. *See Sweet v. Delo*, 125 F.3d 1144, 1149 (8th Cir. 1997), *cert. denied*, 523 U.S. 1010 (1998); *Forest v. Delo*, 52 F.3d 716, 720 (8th Cir. 1995).

Clayton argues that his incompetence during the underlying state proceeding constitutes "cause" for the procedural defect. Clayton also contends that he was provided ineffective assistance of counsel during his post-conviction proceedings and that this too constitutes "cause" for his procedural default. The Court rejects both arguments.[1]

### 1. Clayton's Competency as a Basis for "Cause"

Clayton is correct that mental incompetence may excuse a habeas petitioner's procedural deficiencies. In *Ervin v. Delo*, 194 F.3d 908 (8th Cir. 1999), the Eighth Circuit stated:

> [T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule. . . . For mental illness to excuse the procedural bar arising from the failure to pursue state postconviction remedies, the petitioner must make a conclusive showing that he or she was incompetent at the time of the post-

---

[1] Even if Clayton could establish cause, he has still failed to establish prejudice because there is not sufficient evidence to show that he would be able to establish the requirements of Mo. Rev. Stat. 552.030(1). *See infra* discussion of Claim 26.

conviction proceedings. . . .  To be deemed incompetent, the petitioner must
have been suffering from a mental disease, disorder, or defect that may
substantially affect his capacity to appreciate his position and make a
rational choice with respect to continuing or abandoning further litigation.

*Id.* at 915 (citations omitted).  A petitioner's incompetence, however, must be

conclusively supported by evidence in the record before it can constitute "cause" for a

procedural default.  *See Anderson v. White*, 32 F.3d 320, 322 (8th Cir. 1994) (unsupported

allegation of incompetence insufficient); *Stanley v. Lockhart*, 941 F.2d 707, 710 (8th Cir.

1991) (inconclusive findings of incompetency insufficient).

In *Ervin*, the petitioner submitted affidavits from his post-conviction counsel and a

licensed psychologist, both of which concluded that his severe depression impeded his

ability to pursue his post-conviction remedies.  Nonetheless, the district court denied

Ervin's request for a hearing because Ervin had filed a *pro se* post-conviction motion and

there was no evidence he was unable to consult with his counsel.  The Eighth Circuit

affirmed, stating: "Because Ervin did not make a sufficient showing of incompetence at

the time of his state-court default, we conclude the district court did not abuse its

discretion in denying an evidentiary hearing."  *Id.* at 916.

Clayton's only evidence that he was incompetent at the time of his Rule 29.15

proceeding comes from the testimony of Dr. Daniel Foster.  This testimony was given

during Clayton's 29.15 hearing before the Circuit Court of Jasper County, and was not

found credible by the Missouri courts.  This Court has now reviewed Dr. Foster's

testimony and cannot say that that determination by the Missouri courts was

29

unreasonable.

### 2. Conduct of Clayton's Post-Conviction Counsel as Basis for "Cause"

In *Reese v. Delo*, 94 F.3d 1177, 1182 (8th Cir. 1996), the Eighth Circuit held that ineffective assistance of counsel during post-conviction proceedings at the state level cannot be "cause" for a procedural default. The court stated:

> There is no right to counsel in state post-conviction proceedings . . . and thus a claim that post-conviction appellate counsel was ineffective does not constitute cause for default.

*Id.* at 1182 (citing *Coleman v. Thompson*, 501 U.S. 722, 752 (1991); *Lowe-Bey v. Groose*, 28 F.3d 816, 819 (8th Cir. 1994)). *See also Armstrong v. Iowa*, 418 F.3d 924, 927 (8th Cir. 2005), *cert. denied*, 126 S. Ct. 1351 (Feb. 21, 2006); *Anderson v. Bowersox*, 262 F.3d 839, 842 (8th Cir. 2001) ("Ineffective assistance of post-conviction counsel cannot be the basis for federal habeas relief.") (citing *Reese*, 94 F.3d at 1182). Clayton's fourth claim is denied.

### E. Claim 5: Ineffective Assistance of Counsel for Failure to Present Evidence of Mitigating Brain Injury During Penalty Phase of Trial

Clayton alleges that he was denied effective assistance of counsel during the penalty phase of his proceedings because his counsel did not present mitigating evidence regarding his brain injury and its impact on his behavior. For the same reasons that the Court rejected Clayton's fourth claim, it finds that Clayton's fifth claim is procedurally barred. Because Clayton has failed to establish cause for his procedural default, Clayton's fifth ground for relief is denied. Furthermore, even if it were not defaulted, the

30

petitioner has failed to establish the prejudice required by *Strickland*. There clearly was evidence of Clayton's brain injury before the jury when it imposed the death penalty. It may not have been as well developed as Clayton would now like, but the jury understood that Clayton had a brain injury that had substantially impacted his life.

### F. Claim 6: Ineffective Assistance of Counsel for Failure to Request Jury Instruction Regarding Life Imprisonment Without Parole During Penalty Phase of Trial

Clayton alleges that he was denied effective assistance of counsel during the penalty phase of his proceedings because his counsel did not request a jury instruction regarding life imprisonment as an alternative to the death penalty. Respondent contends that Clayton's sixth claim is procedurally barred because he failed to raise it in his appeal of the circuit court's denial of his Rule 29.15 Motion.

Clayton again states that his attorney's ineffective assistance during the post-conviction proceedings constitutes "cause" for excusing his procedural default. As previously explained, Clayton has no right to any counsel in a Rule 29.15 proceeding. Therefore, Clayton's sixth ground for relief is procedurally barred.

### G. Claim 7: Ineffective Assistance of Counsel for Failure to Present Mitigating Witness Testimony During Penalty Phase of Trial

Clayton asserts that Rhoades provided ineffective assistance when he failed to call the following individuals as mitigating witnesses during the penalty phase of the trial: Paul, Dorsey, Evans, Norma Mitchell ("Mitchell"), and Delores Williams ("Williams"). In evaluating this claim, the Missouri Supreme Court concluded:

31

In this case, none of the five witnesses Clayton mentions would have added anything significant to his case during [the] penalty phase. Much of the testimony presented by these witnesses would have been needlessly cumulative . . . . Clayton argues [the witnesses] all should have been called to testify about his background, his religious faith, his religious ministry to others, or the change in his personality after the accident. During the original trial, Clayton's two brothers and the chaplain from the county jail gave similar testimony, although sometimes they relied on different incidents. Much of the information the witness would have provided was on Clayton's background. There is no requirement that an attorney present any background information on his client during a capital trial's penalty phase.

Their testimony may well have undercut the defense's argument that Clayton's brain injury and ensuing mental incapacity were mitigating factors. For example, Dorsey would have testified about Clayton's violent temper as a young man and would have helped the prosecution argue that Clayton's brain injury was not the only reason behind his actions. Paul would have also testified about how Clayton was still able to do complex mental tasks after his injury, like preaching in revivals. Because the testimony of these five witnesses would have added little to Clayton's case and in some ways may have harmed it, his attorney was not ineffective for failing to call them.

*Clayton*, 63 S.W.3d at 209-10.

### 1. *Leslie Paul*

For the reasons previously discussed, the Court finds that the Missouri Supreme was not unreasonable when it concluded that Rhoades was not ineffective because he chose not to call Paul in the penalty phase.

### 2. *Carolyn Dorsey*

As previously found, Dorsey's testimony about Clayton's personality before the sawmill accident was cumulative and would have opened the door to testimony about Clayton's violent tendencies before the accident. Her testimony that the family was

32

impoverished and that Clayton's dad was hard on him and very strict would have added little, if anything, to the trial. During the defense's case in chief, Rhoades called Clayton's brother, Marvin, to the stand and he testified, "Well, just my Dad was fairly strict, you know. He wasn't abusive, but he expected us to have manners and, you know." *See* Resp. Ex. A-10 at p. 1518. Dorsey's testimony would have been that their father was strict, but not abusive. Her testimony, therefore, is consistent with Marvin Clayton's testimony and would be cumulative.

The Missouri Supreme Court was not unreasonable when it found Dorsey's testimony cumulative and unhelpful.

### 3. *Arnold Evans*

In his Petition, Clayton states that Evans is a pastor who met Clayton through religious activities and that, "Had he been called as a penalty phase witness, Mr. Evans would have testified that if Mr. Clayton were incarcerated for the remainder of his life, he would have had things to offer the prison community. Mr. Evans believed that Mr. Clayton could use his musical talent in prison and help others." *See* Petition [Doc. # 46] at p. 35. Clayton also argues that Evans would have presented evidence about the change in Clayton's demeanor after the sawmill accident. *Id.*

During the penalty phase, the prison chaplain, Thora Shaw ("Shaw") testified that Clayton ministered to other inmates and that he would be a benefit to other persons in prison, including both guards and inmates. Shaw testified that Clayton shared his Bible with other inmates and that he used his singing talents in the prison. *See* Resp. Ex. A-12

33

at pp. 1808-11. Clayton's brother, Jerry Clayton, testified that Clayton participated in religious activities and he was a "God-fearing man." *Id.* at p. 1798. Marvin Clayton testified that Clayton suffered memory loss, a lack of patience, a worsened temper, and a loss of self respect after the accident. Resp. Ex. A-10 at pp. 1526-28.

Given this record, the Missouri Supreme Court was not unreasonable when it found that the testimony of Evans would be needlessly cumulative.

### 4. *Norma Mitchell and Delores Williams*

Mitchell and Williams were Clayton's elderly neighbors. According to Clayton, they would have presented testimony that Clayton was a good neighbor and that he would occasionally help them with projects at their respective homes. *See* Petition [Doc. # 46] at pp. 38-40. They also would have presented testimony regarding Clayton's religious activities. *Id.*

The neighbors' testimony about Clayton's religious background would have been duplicative of the testimony submitted by Shaw during the penalty phase of the hearing. As to their testimony about Clayton's good works and his general congeniality as a neighbor, there is no evidence that would have swayed the jury, particularly where their testimony did not go to any of the possible mitigating factors. The jury overwhelmingly found that Clayton deserved the death penalty because it found the existence of three aggravating factors. Given the de minimis value of the neighbors' testimony, it was reasonable for the Missouri Supreme Court to find that Rhoades was not ineffective for failing to call Clayton's neighbors.

34

Clayton's seventh claim is denied.

### H. Claim 8: Ineffective Assistance of Counsel for Failure to Call Carl Guisendorfer to Testify During Penalty Phase of Trial

Clayton alleges that he was denied effective assistance of counsel during the penalty phase of his proceedings because his counsel did not call Carl Guisendorfer ("Guisendorfer") to testify. According to Clayton, Guisendorfer was a member of the same religious congregation as Clayton and he could have provided mitigating testimony during the penalty phase of the trial. Respondent contends that Clayton's eighth claim is procedurally barred because he failed to raise it in his appeal of the circuit court's denial of his Rule 29.15 Motion.

Clayton again states that his attorney's ineffective assistance during the post-conviction proceedings constitutes "cause" for his procedural default. Because Clayton is not entitled to any counsel at his post-conviction proceeding, the performance of his post-conviction attorney cannot be cause for his procedural default. Clayton's eighth ground for relief is procedurally barred.

### I. Claim 9: Ineffective Assistance of Counsel for Failure to Object to the State's Closing Argument During Penalty Phase of Trial

Clayton alleges that he was denied effective assistance of counsel during the penalty phase of his proceedings because his counsel did not object to the State's incorrect and misleading closing argument. This claim is procedurally defaulted because it was not raised in Clayton's appeal of the denial of his Rule 29.15 motion and Clayton has not established cause for the default. Even if it were preserved, there is no basis for

35

finding that the prejudice prong of *Strickland* has been satisfied. The jury was told it must consider all mitigating circumstances and the mitigating circumstances were clearly identified through both the instruction and argument of counsel. Clayton's ninth ground for relief is denied.

**J.    Claim 10: Ineffective Assistance of Counsel for Failure to Request Jury Instruction Regarding Clayton's Failure to Testify During Penalty Phase of Trial**

Clayton alleges that he was denied effective assistance of counsel during the penalty phase of his proceedings because his counsel did not request a jury instruction that addressed Clayton's failure to testify during the penalty phase of his trial. This claim is procedurally defaulted because it was not raised in Clayton's appeal of the Circuit Court's denial of his Rule 29.15 motion and Clayton has not established cause for the default. Clayton's tenth ground for relief is denied.

**K.    Claim 11: Ineffective Assistance of Appellate Counsel for Failure to Raise Issue of Clayton's Competency to Pursue Appeal**

Clayton alleges that he was denied effective assistance of counsel during the appeal of his post-conviction remedies because his counsel did not raise or pursue Clayton's claim of incompetency. The claim is procedurally defaulted because Clayton failed to raise it in state court. Clayton cannot establish cause for the default because Clayton has no right to have effective representation in a state post-conviction proceeding. His eleventh claim for relief is denied.

**L.    Claim 12: Ineffective Assistance of Appellate Counsel for Failure to Raise Clayton's Procedurally Barred Claims for Relief**

36

Clayton alleges that he was denied effective assistance of counsel because his post-conviction counsel failed to raise those claims listed above that are procedurally barred. In support of this claim, Clayton states:

> Respondent is correct that granting relief on this claim would not, by itself, entitle Mr. Clayton to have his conviction set aside. In an abundance of caution, this claim was included in the petition to make clear that Mr. Clayton asserts that he has a due process right to full and fair post-conviction proceedings, as discussed more fully under Ground 4 above. Any failure to pursue claims in state post-conviction proceedings, therefore, should not prevent this court from reviewing those claims if the court finds that reasonably competent post-conviction counsel would have raised them.

*See* Traverse [Doc. # 65] at p. 48. Because the Eighth Circuit has held that ineffective assistance of counsel during state post-conviction proceedings cannot be the basis for federal habeas relief, Clayton's twelfth claim is denied. Clayton has no right to counsel at the post-conviction stage, so there is no due process right to have effective counsel.

### M. Claim 13: Due Process Challenge Based on Failure of Mitigating Jury Instruction to List Non-Statutory Mitigating Factors

In his thirteenth claim, Clayton challenges the jury instructions submitted in the penalty phase of the trial. Specifically, Clayton challenges Instruction No. 19, which states in its entirety:

> If you unanimously find that the facts and circumstances in aggravation of punishment, taken as a whole, warrant the imposition of a sentence of death upon the defendant, you must then determine whether there are facts or circumstances in mitigation of punishment which are sufficient to outweigh the facts and circumstances in aggravation of punishment. In deciding this question, you may consider all of the evidence presented in both the guilt and punishment stages of trial.
>
> As circumstances that may be in mitigation of punishment, you shall

37

consider:

1.      Whether the murder of Christopher Castetter was committed while the defendant was under the influence of extreme mental or emotional disturbance.

2.      Whether the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

You shall also consider any other facts or circumstances which you find from the evidence in mitigation of punishment.

It is not necessary that all jurors agree upon particular facts and circumstances in mitigation of punishment.  If each juror determines that there are facts or circumstances in mitigation of punishment sufficient to outweigh the evidence in aggravation of punishment, then you must return a verdict fixing defendant's punishment at imprisonment for life by the Department of Corrections without eligibility for probation and parole.

*See* Resp. Ex. B-3 at p. 383.[2]  Although Clayton does not challenge it, Instruction No. 20

is relevant to the Court's discussion.  It states in its entirety:

You are not compelled to fix death as the punishment even if you do not find the existence of facts and circumstances in mitigation of punishment sufficient to outweigh the facts and circumstances in aggravation of punishment.  You must consider all the evidence in deciding whether to assess and declare the punishment at death.  Whether that is to be your final decision rests with you.

*Id.* at p. 384.

Clayton contends the trial court erred when it gave Instruction 19 and rejected his

proposed jury instruction.  The proposed instruction (referred to as "Instruction B") is

_____

        [2]Instruction No. 19 adheres to the Missouri Approved Instructions.  *See* MAI 313.44A (3d ed.).

exactly the same as Instruction 19, except it adds the following two categories of

mitigating circumstances:

> 3.      Whether the defendant acted under the influence of alcohol or other intoxicants at the time of the offense.

> 4.      Whether the defendant had a mental disease or defect at the time of the offense.

*See* Resp. Ex. B-3 at p. 389-90.

The Missouri Supreme Court considered Clayton's argument on direct appeal and

held:

> As his ninth point, Clayton contends that the trial court erred in rejecting his proposed penalty phase Instruction B. Instruction B included a listing of statutory and non-statutory mitigating circumstances. Clayton contends the evidence supported the two non-statutory mitigating factors and that the denial of the instruction prevented the jury from giving full consideration to mitigating evidence. Clayton's claim has been repeatedly rejected by this Court. [citations omitted] The jury was given Instruction 19 that included all the statutory mitigating circumstances to which Clayton was entitled. Instruction 19 included a catch-all paragraph stating 'you should also consider any other facts or circumstances which you find from the evidence in mitigation of punishment.' The trial court did not err in refusing Clayton's Instruction B.

*Id.* at 478 (internal citations omitted). Clayton contends that the Missouri court's

determination is "an unreasonable application of clearly established federal law."

The Eighth Circuit has previously rejected claims almost identical to Clayton's. In

*Powell v. Bowersox*, 112 F.3d 966 (8th Cir. 1997), Powell claimed that the trial court

erred when it refused to instruct the jury "to consider in mitigation whether 'the capacity

of the defendant to appreciate the criminality of his conduct or to conform his conduct to

the requirements of the law was substantially impaired.'" *Id.* at 970. Powell claimed that the evidence supported the proffered instruction because he was "borderline mentally retarded" and he had consumed a "large amount of alcohol before the attack." *Id.*

The Eighth Circuit rejected Powell's claim. The court stated:

Two of the instructions that the trial court gave in this case stated that in determining whether any mitigating circumstance existed the jury could "consider all of the evidence" and "any circumstances which you find from the evidence in mitigation of punishment." Two other instructions, moreover, indicated to the jury that it had to "consider all the circumstances in deciding whether to assess and declare the punishment at death."

***

Evidence relevant to Mr. Powell's mental state was presented over the course of several days. The instructions authorized the jury to weigh all of the evidence presented during that time, including the evidence that Mr. Powell complains was precluded from consideration. Although the charge did not include the instruction at issue, the trial court did direct the jury consider the totality of the evidence. We conclude that the charge did not preclude the jury from considering any mitigatory evidence and therefore it was not unconstitutional.

*Id.* at 970.

Similarly, in *Tokar v. Bowersox*, 198 F.3d 1039, (8th Cir. 1999), the Eighth Circuit found that the trial court's refusal to instruct the jury on any mitigating factors was not error where the trial court's instructions informed the jury that it "may also consider any circumstances which you find from the evidence in mitigation of punishment." *Id.* at 1050. The court found "the language in the approved instruction . . . adequately covered the jury's consideration of mitigating evidence and complied with constitutional requirements for the submission of mitigating circumstances in death penalty cases." *Id.*

40

As in *Powell* and *Tokar*, the jury instructions in this case included a "catch-all" provision that advised the jury to consider "any other facts or circumstances which you find from the evidence in mitigation of punishment." *See* Instruction No. 19. Moreover, Instruction No. 20 included a similar admonition when it stated, "You must consider all the evidence in deciding whether to assess and declare the punishment at death." *See* Instruction No. 20. Thus, the jury was twice instructed to consider all the circumstances presented during both phases of the trial to determine whether the death penalty was appropriate--not just those mitigating factors specifically delineated in Instruction No. 19. Eighth Circuit precedent makes it clear that these instructions pass constitutional muster.

Clayton contends, however, that the United States Supreme Court, in *Penry v. Johnson*, 532 U.S. 782 (2001) (*Penry II*), found a similar instruction unconstitutional. In *Penry*, the jury was instructed to answer three questions. "[T]he jury had to determine whether Penry acted deliberately when he killed Pamela Carpenter; whether there was a probability that Penry would be dangerous in the future; and whether Penry acted unreasonably in response to provocation." *Id.* at 789. The jury instruction went on to explain that the jury's answer to these questions should reflect the jury's finding "'as to the personal culpability of the defendant.'" *Id.* at 789.

> You are instructed that when you deliberate on the questions posed . . ., you are to consider mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the state or the defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character and record or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circumstances in this case,

41

you must decide how much weight they deserve, if any, and therefore, give
effect and consideration to them in assessing the defendant's personal
culpability at the time you answer the [questions posed]. If you determine,
when giving effect to the mitigating evidence, if any, that a life sentence, as
reflected by a negative finding [on a question posed], rather than a death
sentence, is an appropriate response to the personal culpability of the
defendant, a negative finding should be given to one of the [questions].

*Id*. at 789-90.

Given the structure of the jury instructions in *Penry*, the Supreme Court found that

the only way the jury could give full consideration to matters in mitigation would be to

answer the questions posed in the instructions dishonestly. For example, if the jury

believed that Penry acted deliberately, but thought that Penry should receive a life

sentence rather than death because of mitigating circumstances, it would have to answer

no to the question which asked whether Penry acted deliberately. "In other words, the

jury could change one or more truthful "yes" answers to an untruthful "no" answer in

order to avoid a death sentence for Penry." *Id.* at 799.

Because the instruction concerning matters in mitigation had no practical effect,

the Supreme Court granted Penry's request for habeas relief. It went on to hold that "[a]

clearly drafted catchall instruction on mitigating evidence . . . might have complied with

[the constitution]." *Id.* at 803. The Supreme Court also strongly suggested that a new

pattern instruction adopted in Texas after Penry was tried, would be sufficient. That

instruction asked the jury "'[w]hether, taking into consideration all of the evidence,

including the circumstances of the offense, the defendant's character and background, and

the personal moral culpability of the defendant, there is a sufficient mitigating

42

circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.'" *Penry* at 803 (quoting Tex. Code Crim. P. Ann., Art. 37.071(2)(e)(1) (Vernon Supp. 2001).

There is nothing in *Penry* that would support a finding that Instruction 19 used in Clayton's trial is constitutionally defective. Instruction 19 requires the jury to consider two specific issues in mitigation but goes on to say that the jury "shall also consider any other facts or circumstances which you find from the evidence in mitigation of punishment." *See* Resp. Ex. B-3 at p 383. Instruction 20 then instructs the jury that they are not required to impose the death penalty even when facts in mitigation do not outweigh facts in aggravation. "You must consider all the evidence in deciding whether to assess and declare the punishment at death. Whether that is to be your final decision rests with you." *Id.* at p. 384. These instructions require the jury to give full consideration and effect to all issues in mitigation, whether they are specifically listed in the instructions or not. This point was also made by both the prosecuting attorney and Clayton's attorney during closing argument in the penalty phase of the trial. *See* Resp. Ex. A-12 at p 1841, 1849.

The Missouri Supreme Court's determination that the jury was properly instructed is not "contrary to clearly established Federal law." Clayton's thirteenth claim for relief is denied.

**N.     Claim 14: Insufficiency of the Evidence to submit "Depravity of Mind" Jury Instruction**

43

Clayton asserts that there is insufficient evidence to support a finding that Clayton chose his victim at random, therefore, Instruction No. 17 was given in error. He also claims that it was inconsistent for the jury to find that the murder was random and that the victim was an on duty police officer. Instruction No. 17 outlined four possible aggravating factors:

1.    Whether the defendant was convicted of assault in the second degree on June 15, [illegible handwritten edit] in the Circuit Court of Lawrence County of the State of Missouri.

2.    Whether Christopher Castetter was a peace officer, and whether that murder was committed during the exercise of his official duty.

3.    Whether the murder of Christopher Castetter involved depravity of mind and whether, as a result thereof, the murder was outrageously and wantonly vile, horrible and inhuman. You can make a finding of depravity of mind only if you find that the defendant's selection of the person killed was random and without regard to the victim's identity and that defendant's killing of Christopher Castetter thereby exhibited a callous disregard for the sanctity of all human life.

4.    Whether the murder of Christopher Castetter was committed for the purpose of avoiding the lawful arrest of defendant.

*See* Resp. Ex. B-3 at p. 380. In its verdict, the jury found the existence of the first three aggravating factors beyond a reasonable doubt, but not the fourth one. *Id.* at p. 394.

The Missouri Supreme Court rejected Clayton's claim that the second and third aggravating factors were inconsistent, stating:

Clayton's argument is incorrect . . . . Aggravator 2 merely requires a finding that Deputy Castetter "was a peace officer" and was killed "during the exercise of his official duty." Nothing within this finding is necessarily inconsistent with a finding that Castetter was also killed at "random and without regard to his identity." Killing a person merely because that person

44

is a law enforcement officer does not negate a finding of randomness, unless a particular purpose is also found specific to the identity of the individual victim. Even had the jury also found aggravator 4, which it did not, the mere fact that Deputy Castetter was killed to avoid Clayton's being arrested by him might have related solely to Castetter's duties as a law enforcement officer and not to his identity as a person.

*Clayton*, 995 S.W.2d at 483-84.

The Missouri Supreme Court's holding is not contrary to clearly established federal law. Nor does it involve an unreasonable determination of fact. Aggravator 2 does not require a finding that Clayton killed Castetter because he was a law enforcement officer--only that Castetter was a police officer and the murder occurred during the exercise of his official duties. Thus, a jury could find that Clayton killed Castetter randomly and that Castetter was a police officer on duty, without being logically inconsistent.

As to Clayton's claim that there was insufficient evidence to support the jury's finding that the murder was random, it appears to be procedurally defaulted. However, even if preserved, and even if there was insufficient evidence, habeas relief is not available because the jury found the existence of two other aggravating factors that warrant the death penalty under Missouri law. The Supreme Court has held "in a non-weighing state, so long as the sentencing body finds at least one valid aggravating factor, the fact that it also finds an invalid aggravating factor does not infect the formal process of deciding whether death is an appropriate penalty." *Stringer v. Black*, 503 U.S. 222, 232 (1992).

The Eighth Circuit has held that Missouri is a non-weighing state where "only one aggravating factor need be present in order to validly impose a death sentence."  *See Harris v. Bowersox*, 184 F.3d 744, 750 (8th Cir. 1999).  *See also Ramsey v. Bowersox*, 149 F.3d 749, 754-55 (8th Cir. 1998); *Sloan v. Delo*, 54 F.3d 1371, 1385-86 (8th Cir. 1995).  Thus, the existence of two other aggravating factors precludes habeas relief for Clayton on this claim.  Clayton's fourteenth claim is denied.

### O.    Claim 15: Trial Court Erred When It Overruled Clayton's Motion to Suppress His Statements and Physical Evidence

Clayton alleges that probable cause was lacking for his warrantless arrest on the night of Castetter's murder and that his statements following his arrest should have been suppressed because of the unlawful arrest.

Clayton raised this issue in his direct appeal to the Missouri Supreme Court.  In its opinion, the court held:

> In his second point, Clayton contends the trial court erred by overruling his motion to suppress evidence.  Clayton asserts that his arrest was not supported by probable cause and that the evidence seized after the arrest should have been suppressed.  The evidence Clayton sought to suppress included statements Clayton made to [the law enforcement officer], a .38 caliber gun seized from outside the home, a gun holster from inside his truck, and samples of paint and rust taken from his truck.
>
> ***
>
> The record supports a finding that probable cause existed at the time of Clayton's arrest.  Deputy Castetter had responded to a dispatch that a blue Toyota pickup with wooden sides had been parked in Dixie Seal's driveway.  Deputies Manning and Bowman also responded to the dispatch.  Upon arriving, they found Deputy Castetter's car against a tree and Deputy Castetter bleeding.  Carolyn Leonard, Dixie Seal's daughter, advised the

46

deputies that Clayton had been there in a blue Toyota pickup with wooden sides. The dispatcher then advised officers to watch for the vehicle driven by Clayton and that Deputy Castetter had been injured.

Chief McCracken heard the dispatch and recognized the description of the vehicle as the same vehicle driven by Clayton earlier in the day when he had seen Clayton at the Country Corner store. Shortly thereafter Clayton's address was verified and Chiefs McCracken and Clark went to Clayton's home. The officers were familiar with Clayton's reputation as a violent person. The officer's arrived at Clayton's home just as Clayton pulled into the driveway. The officers attempted to speak with Clayton, but he acted as though he could not hear them and refused to walk toward the officers. Instead he went to the side of his home where it appeared that he placed something in a stack of cement blocks. Clayton was then restrained. The passenger in Clayton's vehicle advised the officers that Clayton had a gun in the truck. When the officers did not locate the gun in the truck, they looked in the stack of cement blocks where they located the gun. Clayton was then placed under arrest.

Based on these facts, probable cause existed at the time of Clayton's arrest. The trial court did not err in overruling Clayton's motion to suppress evidence.

*Clayton*, 995 S.W.2d at 477.

In *Stone v. Powell*, 428 U.S. 465 (1976), the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search and seizure was introduced at his trial." *Id.* at 494-95. This ruling has been extended by other courts to encompass custodial statements that were made by the defendant after an arrest. *See Larrivee v. MCC*, No. 93-1716, 1993 U.S. App. LEXIS 38072 (1st Cir. 1993); *Towne v. Dugger*, 899 F.2d 1104 (11th Cir. 1990). Also, the Eighth Circuit has applied *Stone* when a defendant claims that

there is no probable cause for arrest. *See Carlson v. State of Minnesota*, 945 F.2d 1026 (8th Cir. 1991) (relying on *Stone* to reject petitioner's challenge that his arrest lacked probable cause); *Gregory v. Wyrick*, 730 F.2d 542 (8th Cir. 1984) (same). Based on the foregoing, the Court rejects Clayton's claim that *Stone* does not apply to his Fourth Amendment challenge to his arrest and the statement given thereafter.

Clayton also argues that he "did not have a full and fair opportunity to litigate his claim because the Missouri court willfully misapplied federal constitutional law." *See* Traverse [Doc. # 65] at p. 54. In support of his argument, Clayton cites two factually distinguishable cases: *Gamble v. Oklahoma*, 583 F.2d 1161, 1165-66 (10th Cir. 1978) and *Herrera v. Lemaster*, 225 F.3d 1176, 1178 (10th Cir. 2000), *cert. denied* 126 S. Ct. 1400 (Feb. 21, 2006).

In *Gamble*, the state court refused to apply the standards regarding admission of evidence contained in *Brown v. Illinois*, 422 U.S. 590 (1975). *See Gamble*, 583 F.2d at 1165. Indeed, the court applied a standard that had been explicitly rejected by *Brown*. *Id.* Thus, the Tenth Circuit granted habeas relief in light of the state court's direct contravention of Supreme Court precedent.

In *Herrera*, the court cited to *Gamble* and declined to apply *Stone* preclusion where the state court failed to consider the evidentiary standard set forth in *Chapman v. California*, 386 U.S. 18 (1967). *See Herrera*, 225 F.3d at 1178.

In the two cases cited by Clayton, the court declined to apply *Stone* where the state court was aware of a Supreme Court precedent and, for whatever reason, did not apply it.

48

In this case, Clayton states that "the Missouri court willfully misapplied federal constitutional law" but he does not identify which concept of federal constitutional law the Missouri court failed to apply. *See* Traverse [Doc. # 65] at p. 54. In setting the standard for probable cause, the Missouri court stated:

> Probable cause to arrest exists when the arresting officer's knowledge of the particular facts and circumstances is sufficient to warrant a prudent person's belief that a suspect has committed an offense . . . . Whether there is probable cause to arrest depends on the information in the officers' possession prior to the arrest . . . . There is no precise test for determining whether probable cause existed; rather, it is based on the particular facts and circumstances of the individual case . . . . Furthermore, probable cause is determined by the collective knowledge and the facts available to all of the officers participating in the arrest; the arresting officer does not need to possess all of the available information.

*Clayton*, 995 S.W.2d at 477 (internal citations omitted). This standard comports with federal law as it is interpreted in the Eighth Circuit. *See Theriault v. United States*, 401 F.2d 79, 81 (8th Cir. 1968) (stating that probable cause "exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed."); *United States v. Lugo-Baez*, 412 F.2d 435, 438-39 (8th Cir. 1969) (same). *See also United States v. Mendoza*, 421 F.3d 663, 667 (8th Cir. 2005) (applying same standard as *Theriault* and noting that collective knowledge of officers is sufficient to establish probable cause) (citations omitted). There is no basis for finding that the Missouri court willfully misapplied federal constitutional law. Finally, there was ample evidence of probable cause to arrest Clayton.

The Court rejects Clayton's fifteenth claim for relief.

49

**P.     Claim 16: Trial Court Erred When It Admitted Testimony from Witnesses that Martha Ball was Afraid of Clayton on the Night of Castetter's Murder**

Clayton asserts the trial court violated his constitutional rights when it admitted the testimony of Martha Ball ("Ball"), Vicky Deeter ("Deeter"), and Carolyn Leonard ("Leonard") who all testified that Ball was afraid of Clayton on the night he shot Castetter.

The Missouri Supreme Court rejected Clayton's argument in the direct appeal of his sentence. It stated:

> Clayton contends that the trial court plainly erred by allowing the testimony of Martha Ball, Vicky Deeter, and Carolyn Leonard that Martha Ball was afraid of Clayton on the night of November 27, 1996. Clayton contends that the testimony suggested that he had a propensity to do things that were bad, violent, or fearsome and may have suggested to the jury that Clayton was involved in other crimes. Martha Ball testified, "I was scared; he pushed me one time, and he had been drinking, so I didn't want to go with him." She also stated that she did not want to go back to her mother's home "because I was afraid." Vicky Deeter testified that when Martha arrived at her home on the evening of November 27, "she was very shook up, white as a sheet and scared. She was pretty scared." She also stated that Martha "was shaking from head to toe. She had to sit down for a while before I could get her to talk. Like I said, she was just as pale as you could get." Lastly, Carolyn Leonard testified that Martha "was scared" and she knew that Martha was scared "because she told me she couldn't come home."
>
> The evidence presented through Ball, Deeter, and Leonard "cannot be characterized as clear evidence associating Clayton with other crimes." . . . Rather, this testimony provided a complete and coherent picture of the crime charged. . . . The testimony in question also cannot be held to have had a decisive effect on the jury, especially when coupled with Ball's testimony that she still loves Clayton and has been to visit him since his arrest. Clayton has not established that manifest injustice or a miscarriage of justice resulted from the admission of this evidence.

50

*Clayton*, 995 S.W.2d at 481 (internal citations omitted).

Because the Missouri Supreme Court reviewed the claim for plain error, this Court must as well. *Graham v. Dormire*, 212 F.3d 437, 439 (8th Cir. 2000) ("Because state courts reviewed Graham's contentions concerning the prosecutor's closing argument solely for plain error, so also do we.") (citing *Kilmartin v. Dormire*, 161 F.3d 1125, 1127 (8th Cir. 1998)). Under that standard of review, habeas relief will not be granted unless "manifest injustice resulted" from a violation of due process. *Thomas v. Bowersox*, 208 F.3d 699, 701 (8th Cir. 2000). The evidentiary error must fatally infect the trial. *See Bounds v. Delo*, 151 F.3d 1116, 1119 (8th Cir. 1998).

Clayton argues that the improperly admitted testimony was tantamount to allegations of uncharged misconduct. The closest testimony to that effect was Ball's one statement that Clayton had pushed her. This was an isolated reference that was well short of totally infecting the trial. *Bounds*, 151 F.3d at 1119. The remaining evidence merely related that Ball was frightened the evening of Castetter's murder, and there were only a few questions in the record to that effect. Given the overwhelming evidence against Clayton, and the fact that Ball testified she still loved him despite her fear on the evening at issue, the Court cannot conclude that the testimony fatally infected the trial and deprived Clayton of due process. It is not reasonable to speculate that, but for this evidence, the jury would not have sentenced Clayton to death because, even if characterized as domestic abuse, this evidence pales in comparison to the fact that Clayton killed a police officer. Clayton's sixteenth claim for relief is denied.

51

**Q.** **Claim 17: Trial Court Erred When It Admitted Testimony of William Rogers and Robert Compton that Clayton Had Made Threats of Violence**

Clayton contends the trial court erred when it admitted the testimony of his

cellmates about their jailhouse conversations regarding law enforcement. The Missouri

Supreme Court rejected Clayton's claim, stating:

> Clayton contends the trial court plainly erred by allowing the testimony of his jail-mates, William Rogers and Robert Compton, regarding Clayton's statements to them about the offense and about shooting the jail guards. He contends that their testimony provides evidence of other crimes and bad acts.
>
> William Rogers testified that Clayton talked about his inability to obtain bond, that "he wanted to get out, escape," and that he talked with Rogers about escaping. Rogers also testified that Clayton told him about shooting the officer, that "[Clayton] walked right up to the door of the police car and shot him" and that "[Clayton] took his .38 and walked right up to the car and shot him before the other guy had a chance."
>
> Robert Compton also testified that Clayton had talked with him about the shooting. Compton testified that:
>
>> He had told me he had shot the -- Barry County Officer.
>>
>> ***
>>
>> He told me he had shot him through the window of his -- police car.
>>
>> ***
>>
>> He told me it was either him or the officer, he believed that the officer was going to shoot him, and - he said the officer pulled up and he had to make a choice then. He had a pistol behind his back and he said that he just shot the cop before the cop would shoot him, and then he just made gestures, you know, acting like he had a gun in his hand.

***

He didn't tell me whether he knew him or not. He told me that the officer deserved it, that he had been harassing a lot of people, and he said somebody should have shot him before.

Compton also testified about Clayton's dislike of the other officers and jail guards.

Q:      Did the defendant ever say anything about any other officers?

A:      Uh, just the officers that arrested him. His first thought was to shoot them too and go ahead and get out of state at that time. And the officers at Lawrence County Jail.

Compton testified that Clayton wanted to escape and had attempted to unlock the turnkey with a piece of metal, that he wanted Compton's assistance in getting out of the country, and that Clayton stated that the jail guards "deserved to, you know, have it done to them too."

Clayton's statements concerning Deputy Castetter are admissions of the crime and admissible without question. These statements have nothing to do with other crimes or uncharged bad acts.

The evidence regarding talk of escape was relevant in that it tended to show a consciousness of guilt.

Likewise, evidence regarding Clayton's dislike of the jail guards and law enforcement officers does not necessarily constitute evidence of another crime. This testimonial evidence was relevant to establish Clayton's motive in shooting Officer Castetter. The state's theory of motive was that Clayton had a problem with law enforcement officers in general and that he shot Officer Castetter to avoid arrest and revocation of his probation.

*Clayton*, 995 S.W.2d at 481-82. It does not appear that Clayton challenges the testimony regarding the murder of Castetter. Instead Clayton argues that the evidence regarding other law enforcement officers "constituted nothing more than the admission of bad character evidence in an attempt to prove Clayton's propensity to commit this crime."

53

*See* Traverse [Doc. # 65] at p. 58.

Clayton can be successful on this claim only if the evidence regarding other law enforcement officers was "so conspicuously prejudicial or of such magnitude as to fatally infect the trial and deprive the defendant of due process." *Bounds*, 151 F.3d at 1119. It was not, and in fact the Missouri Supreme Court accurately explained why the evidence was admissible. Furthermore, given the overwhelming evidence against Clayton, there is no basis for finding that the evidence infected the trial and deprived Clayton of due process. *Bounds*, 151 F.3d at 1119.

### R.    Claim 18: Trial Court Erred When It Admitted Photograph of Victim from Clayton's Prior Assault Charge

Clayton argues that his constitutional rights were violated when, during the penalty phase of his trial, the trial court admitted a blown-up photograph of the victim from Clayton's earlier assault conviction. The Missouri Supreme Court considered the argument and held:

> As his sixth point, Clayton contends that the trial court erred by admitting a photograph of . . . the victim of a 1991 assault committed by Clayton, at penalty phase. Clayton contends that the photograph was not indicative of the nature and extent of [the victim]'s injuries and was prejudicial. The photograph depicts [the victim]'s face and shirt covered with blood.

> ***

> The trial court did not err in admitting the photograph of [the victim] into evidence. Officer Jerry Paul testified that he investigated the assault and that the photograph was a fair and accurate representation of [the victim] immediately following the assault. He testified that [the victim] suffered only a bloody nose from the assault and incurred no broken bones. Defense counsel read a stipulation that [the victim]'s actual injuries consisted of

54

bruising and a cut on his nose.

*Clayton*, 995 S.W.2d at 477-78.  Clayton now argues that "the photograph exaggerated [the victim's injuries] and impermissibly inflamed the jury."  *See* Traverse [Doc. # 65] at p. 59.

Even if the victim's photograph did not accurately portray the victim's injuries, any defect was cured by the testimony of Paul who indicated that the victim suffered only a bloody nose and did not suffer from any broken bones.  Moreover, the stipulation read by Clayton's counsel about the extent of the injuries also remedied any misleading conclusions that could be drawn from the picture.  Because the testimony and the parties' stipulation minimized the inflammatory nature of the photograph, the Court declines to find that the photograph alone was "so conspicuously prejudicial or of such magnitude as to fatally infect the trial and deprive the defendant of due process."  *Bounds*, 151 F.3d at 1119.

**S.    Claim 19: Due Process Challenge Based on Insufficient Evidence to Support Jury Finding that Clayton Acted with "Depravity of Mind"**

In his nineteenth claim for relief, Clayton asserts that he was denied due process because there was insufficient evidence to support the finding that he randomly killed Castetter.  As the Court has previously found, even if there was insufficient evidence to submit "Depravity of Mind" as an aggravating factor, it constituted harmless error because the jury found two other valid aggravating factors, one of which is irrefutable–Castetter was a police officer and he was on duty when he was killed.  *See*

55

*Stringer v. Black*, 503 U.S. 222, 223 (1992); *Harris v. Bowersox*, 184 F.3d 744, 750 (8th Cir. 1999).

T.    **Claim 20: Due Process Challenge Based on the State's Referral to Clayton's Evidence as "Voodoo"**

Clayton argues that he was deprived of his constitutional rights when the prosecuting attorney referred to Clayton's mental competency evidence as "voodoo" and called it "an excuse." *See* Traverse [Doc. # 65] at p. 60. The Missouri Supreme Court summarily rejected Clayton's assertion. *Clayton*, 995 S.W.2d at 480. The prosecutor's entire statement at issue is as follows:

> And in the face of all this, we're told that the defendant couldn't deliberate. We're told that by, well, Dr. Betty [sic] Back. And I'll talk about her a little bit more.
>
> But, folks, I think she said something, and you notice that she didn't want to deal with the facts surrounding this incident, did she? She wanted to deal with her nice little computer tests. She wanted to deal with her nice clean little numbers. This isn't clean; it's murder. It's dirty and it's ugly, and if you don't look at the facts, you don't know what happened.
>
> So he couldn't plan. Well, ma'am, we pointed out to her, not only could he plan, he did plan.
>
> "Well, he didn't plan in a socially acceptable manner." Well, I've never met a criminal who did. That is not only unlikely, it's preposterous. It's absolutely preposterous.
>
> "Well, they don't have very good judgment." Well, as far as I'm concerned somebody who buys a Toyota doesn't have very good judgment because I don't like Toyotas. That doesn't mean there's anything wrong with their ability to reason. Folks, it's voodoo, that's all it is. It's an excuse.

*See* Resp. Ex. A-11 at pp. 1648-49.

56

In evaluating claimed prejudice based on a prosecutor's closing argument, courts look to whether the comment in dispute "by itself so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 642-43 (1974); *Darden v. Wainwright*, 477 U.S. 168, 180-82 (1986). To establish a constitutional deprivation, "It is not enough that the prosecutor's remarks were undesirable or even universally condemned." *Darden*, 477 U.S. at 181. Examples of prosecutorial comments that might lead to a constitutional deprivation include, but are not limited to, comments that "manipulate or misstate the evidence" or those that "implicate other specific rights of the accused such as the right to counsel or the right to remain silent." *Id.*

Clayton cites *Shurn v. Delo*, 177 F.3d 662 (8th Cir. 1999), and *Gall v. Parker*, 231 F.3d 265 (6th Cir. 2000), to show that his prosecutor's comments deprived him of his constitutional rights. In *Shurn*, "The prosecutor emphasized his position of authority and expressed his personal opinion about the propriety of the death sentence. He attempted to link Shurn with Charles Manson, a well-known mass murderer. He appealed to the jurors' fears and emotions and told them to kill Shurn." *Shurn*, 177 F.3d at 667. The court found that the closing was "filled with improper statements" and it was "obviously improper and prejudicial." *Id.*

In *Gall*, the prosecutor expressed his personal opinion about the defendant's culpability and the credibility of the expert witnesses, including comments about the prosecutor's expert witness such as, "I have known him for a long time and I know he is a

57

fine man." *Gall*, 231 F.3d at 312. The prosecutor also blatantly mischaracterized the expert witness testimony in the case. *Id.* He openly mocked all the insanity defense witnesses, and the prosecutor noted that Gall was calm during the trial, which must lead to a finding that he was sane and lucid at the time of the murder. Finally, he implored the jury not to be "hoodwinked" into believing an insanity defense and pointed to the "smoking gun" that was part of his case. *Id.*

In Clayton's case, the prosecutor used terms such as "absolutely preposterous" "voodoo" and "an excuse" to characterize Clayton's mental incompetency defense. *See* Resp. Ex. A-11 at pp. 1648-49. While this Court would not have permitted such statements, it cannot say that the Supreme Court was unreasonable when it summarily rejected Clayton's claim. The prosecutor's statements in Clayton's case were isolated in nature and substantially less inflammatory than the prosecutor's statements in *Gall*. The Court cannot say that Clayton's prosecutor's statement "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 642-43 (1974), nor that the decision by the Missouri Supreme Court to reject Clayton's claim was unreasonable.

## U.  Claim 21: Due Process Challenge Based on the State's Closing Argument During the Penalty Phase

Clayton argues he suffered a constitutional violation when, at the close of the penalty phase, the prosecutor (1) argued that Clayton planned to commit other crimes the night that he killed Castetter, (2) referred to his experience as a soldier; (3) argued that

58

Rhoades had implied there was something wrong with the jury if they returned a death sentence; and (4) stated that Clayton had received the benefit of "legal niceties" that were not available to Castetter.

### 1.    *Clayton's alleged plan to commit other crimes*

To support his contention that Clayton shot Castetter for the purpose of avoiding arrest, the prosecutor stated:

> And for whether the murder of Christopher Castetter was committed for the purpose of avoiding lawful arrest. Well, what do we know?
>
> We know that the defendant was on probation. We know he faced, therefore, a prison sentence if that probation was violated.
>
> We know that possession of a gun violated that probation, and we know that drinking alcohol violated that probation.
>
> And certainly if he intended some ill toward anyone else, which well may have been his intent at Dixie Seal's drive after the argument he had with Martha Ball, that would have broken the law as well.

*See* Resp. Ex. A-12 at pp. 1838-39. Clayton contends that the last paragraph violated his constitutional rights because it suggested to the jury that Clayton intended to harm other people besides Castetter that evening. The Missouri Supreme Court rejected Clayton's contention and held:

> During closing argument, a prosecutor is entitled to make reasonable inferences from the evidence. While the prosecutor's statement may have suggested that Clayton went to Dixie Seal's home to commit other crimes, the statement can reasonably be inferred from the evidence presented in the case.

*Clayton*, 995 S.W.2d at 480.

59

The record shows that Clayton arrived at Seal's home with a loaded handgun, Clayton had been arguing with Ball--Seal's daughter--earlier in the day and Ball was staying at Seal's home. Clayton sat in a parked car at the end of Seal's driveway drinking beer alone rather than approaching the home. Given these undisputed facts, the Missouri Supreme Court's determination that the prosecutor could argue the inference that Clayton arrived at Ball's home with the intent to commit some other crime is not an unreasonable determination of the facts or an unreasonable application of federal law.

### 2. *Prosecutor referred to himself as a soldier*

The prosecutor's statement at issue is:

> Me, having been a soldier, I guess I can imagine reasons why a person would kill. I don't understand killing a police officer. If you'll kill a police officer, you would kill anyone. That is a figure of authority.

*See* Resp. Ex. A-12 at p. 1840. The Missouri Supreme Court summarily rejected Clayton's claim because: "Taken in context, this statement was made by the prosecutor while encouraging the jury to assess the most severe penalty, the death penalty. Urging a jury to impose the most severe penalty is proper argument." *Clayton*, 995 S.W.2d at 480 (citations omitted).

Again, Clayton directs the Court to *Shurn* and *Gall*. In *Gall*, the prosecutor interjected his personal beliefs into the case, but those beliefs went to the credibility of the key witnesses in the case. The court acknowledged as much when it stated, "throughout his closing argument the prosecutor improperly expressed his personal belief about *critical matters* before the jury." *Gall*, 231 F.3d at 312 (emphasis added). In Clayton's

60

case, the prosecutor's comment about formerly being a soldier and not being able to understand how someone could kill an officer did not go to a credibility determination; the comment was isolated and there is no basis for concluding that in the absence of these statements, the jury would have rejected the death penalty.

In *Shurn*, the prosecutor identified himself as "the top law enforcement officer in this county" as a way to demonstrate his authority in asking for the death penalty. *Shurn*, 177 F.3d at 666. In this case, the prosecutor's passing reference to his former service as a soldier does not carry the same weight because his reference was in the past tense and it did not contain the same nexus between his position of authority and the case before the jury. Moreover, the prosecutor in *Shurn* committed a long litany of errors, in that, "The prosecutor emphasized his position of authority and expressed his personal opinion on the propriety of the death sentence. He attempted to link Shurn with Charles Manson, a well-known mass murderer. He appealed to the jurors' fears and emotions and told them to kill Shurn." *Shurn*, 177 F.3d at 667. The concurring opinion to *Shurn* characterized the prosecutor's closing argument as "an appeal to blood lust and mob justice rather than a call for the jury to return a sentence of death after a calm, reasoned deliberation." *Id.* at 668 (Wollman, J. concurring).

A contextual reading of the prosecutor's closing argument in Clayton's case demonstrates that he walked the jury through the penalty phase jury instructions and explained them to the jury. *See* Resp. Ex. A-12 at pp. 1834-42. Just a few lines after his "soldier" comment, the prosecutor came to Instruction No. 19, which dealt with

61

mitigating circumstances, and stated:

> Mitigating circumstances, those are in Instruction 19, by the way, and please look at them. Those--there are two mitigating circumstances that are listed there. Now, that's not all you consider, of course. Please consider all the evidence. There may be other factors you think are appropriate to consider.

*Id.* at p. 1841. Thus, the prosecutor's closing argument was not "an appeal to blood lust and mob justice" that is comparable to the closing argument that was at issue in *Shurn*. Given the record, the Court cannot say that the Missouri Supreme Court made an unreasonable determination of fact or an unreasonable application of federal law when it rejected this claim.

### 3.   *Retaliation argument*

In his closing argument during the penalty phase, Rhoades stated: "I ask you to impose a sentence of life, and not to impose a sentence of death simply because he's different or because he's defective." *See* Resp. Ex. A-12 at 1853. Rhoades also repeatedly implored the jury to consider the inherent value in Clayton's life. *Id.* In his rebuttal, the prosecutor stated:

> Folks, what we're dealing with here is, yes, there is value in human life, and Christopher Castetter's life had value too, a great deal of value. A suggestion to you that there is something wrong with you issuing a death sentence where it is called for is preposterous.

*Id.* at p. 1857. According to Clayton, the statement was improper because, "Personal attacks on defense counsel are beyond the pale of proper argument, whether they are made in the context of asking for a death sentence or asking for a conviction." *See*

62

Traverse [Doc. # 65] at p. 63.

The Missouri Supreme Court rejected Clayton's argument. The court held, "Again, it is proper for a prosecutor to seek and request the most severe penalty. It is also proper for a prosecutor to retaliate to statements made by defense counsel, even to the point of characterizing a defense theory as 'preposterous.'" *Clayton*, 995 S.W.2d at 480.

The prosecutor's statement cannot be categorized as a "personal attack" on Rhoades. The comment was made in response to the substance of Rhoades's argument that the jury should not punish Clayton because he is "different" or "defective." Furthermore, even if the statement should have been stricken by the trial judge, it clearly did not fatally infect the trial. *Bounds*, 151 F.3d at 1119.

### 4. *"Legal Niceties" comment*

Finally, Clayton argues he suffered a constitutional deprivation when the prosecutor said the following:

> You cannot be compared to Cecil Clayton. You have done nothing wrong. Look at all the legal niceties we have danced through to get to the point where you can make this decision. Those legal niceties were not available to Christopher Castetter because one man chose to play God.

*See* Resp. Ex. A-12 at pp. 1857-58. To put this statement into context, the following paragraph which immediately preceded the statement in dispute must be considered.

> Folks, what we're dealing with here is, yes, there is value in human life, and Christopher Castetter's life had value too, a great deal of value. A suggestion to you that there is something wrong with you issuing a death sentence where it is called for is preposterous.

*Id.* at p. 1857. Thus, the prosecutor's reference to "legal niceties" is related to his

63

argument that it was not wrong for the jury to impose the death penalty.

Clayton argues the statement denigrated the court proceedings and unfairly punished Clayton for exercising his constitutional right to a trial. He also argues that the prosecutor's statements minimized the jury's responsibility for the sentence. The Missouri Supreme Court rejected Clayton's contention. *Clayton*, 995 S.W.2d at 480-81.

Clayton directs the Court to *Driscoll v. Delo*, 71 F.3d 701 (8th Cir. 1995), to support his argument that the comments minimized the jury's responsibility for the sentence. In *Driscoll*, the prosecutor told the jury that their decision regarding the death penalty would be reviewed on appeal to ensure correctness. *Id.* at 712. He also instructed them that "(1) juries do not sentence defendants to death, and (2) it did not matter whether the jury sentenced Driscoll to death because the judge could simply overrule the decision." *Id.* at 713. In granting habeas relief, the court held:

> [The prosecutor's comments] fundamentally misrepresented the significance of the jury's role and responsibility as a capital sentencer and misled the jury as to the nature of the judge's review of its sentencing determination. . . . The prosecutor essentially told the jury that it could defer the extremely difficult decision of whether or not Driscoll should be sentenced to death. As a consequence, the jury made the decision that Driscoll would be killed without full recognition of the importance and finality of doing so and, therefore, without affording the decision the full consideration it required.

*Id.* at 713 (internal citation omitted). *Driscoll* is clearly distinguishable from Clayton's case because the prosecutor never attempted to assign the responsibility for imposing the death penalty to any other party.

To the contrary, the prosecutor stated, "The decision you face is difficult. I don't

64

pretend it isn't." *See* Resp. Ex. A-12 at p. 1858. He also stated, "I'm sure none of you have asked for this job, okay. I understand that. You've got a tough decision to make. It shouldn't be easy. It should be hard. But the simple fact of the matter is we are dealing here with one of the most extreme circumstances, and that is killing a police officer." *Id.* at p. 1857.

There is no basis for finding that the statement about legal niceties punished Clayton for pursuing his right to trial or inappropriately denigrated the judicial process. The comment was made in response to Rhoades's suggestion that it would be wrong for the jury to sentence Clayton to death, and accurately pointed out that Clayton received a trial but the decedent had no legal process. The statements were in clear rebuttal to Rhoades's closing argument and not to suggest that Clayton should not have had a trial.

### 5. *Summary*

Clayton has attacked the prosecutor's penalty phase closing argument on several fronts, but the Court does not find that the comments in dispute "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 642-43. The Missouri Supreme Court has rejected Clayton's arguments in their entirety and there is no basis for finding that the Missouri court's decision was "contrary to clearly established Federal law" or that it suffers from an "unreasonable determination" of the facts. *Lomholt*, 327 F.3d at 751. Accordingly, Clayton's twenty-first claim is denied.

### V. Claim 22: Due Process Challenge Based on the State's Closing

65

**Argument During the Penalty Phase**

Clayton also alleges he suffered a constitutional deprivation when the prosecutor

made the following argument during the penalty phase of the trial:

> I think counsel said one thing here that is interesting, in that I think it shows
> the fallacy of what he has suggested to you. And that is he said the
> punishment should fit the criminal. You will find that nowhere in our law,
> nowhere in our tradition. Punishment should fit the crime. That's what
> you'll find in our law and in our tradition. The focus should not be on the
> criminal, but should be on the crime, and I think that is instructive.

*See* Resp. Ex. A-12 at p. 1854.

> Punishment here must fit the crime, and if it doesn't, then it diminishes us
> all. We are not here to judge Cecil Clayton as a person, we are here to
> punish him for the crime he's committed. There is a difference. The crime
> calls for the ultimate penalty, and that's what I ask you for.

*Id.* at p. 1858. According to Clayton, the prosecutor "incorrectly told the jury that the law

does not permit consideration of the defendant's individual characteristics, rather the law

only permits consideration of the circumstances of the crime." *See* Petition [Doc. # 46] at

p. 55. Clayton alleges that the prosecutor's argument "violated long standing principles

that require the sentencing body to take into account the circumstances of the offense and

the character and propensities of the offender." *Id.*

The Missouri Supreme Court rejected Clayton's claim, stating: "The prosecutor's

argument that the punishment should fit the crime was retaliation to defense counsel's

statement that the punishment should fit the criminal since consideration of both the crime

and the criminal is required to determine the appropriate sentence." *Clayton*, 995 S.W.2d

at 479.

In support of his argument, Clayton directs the Court to *Romine v. Head*, 253 F.3d 1349 (11th Cir. 2001), but it is inapplicable.  In *Romine*, the defendant was on trial for murdering his parents.  During the penalty phase, the prosecutor quoted specific scriptures from the Bible and the Fifth Commandment to suggest that a "higher authority" required that Romine be sentenced to death.  The prosecutor also advised the jury, "You may want to pray about that and be sure you're doing the right thing and ask for guidance."  *Id.* at 1361.  In *Romine*, there was evidence that the prosecutor's argument influenced the process because one of the jurors consulted the Bible during the deliberations and two of the jurors discussed the passages cited by the prosecutor.  *Id.* at 1362-63.

The Eleventh Circuit condemned the prosecutor's closing argument and granted habeas relief.

> [A] prosecutor misleads a capital sentencing jury when he quotes scripture as higher authority for the proposition that death should be mandatory for anyone who murders his parents.  And that is what the prosecutor argued to the jury: In the Bible God said that anyone who kills his parents should be put to death, no "if's", "ands", or "buts" about it.  That may or may not be Biblical law, but it is not post-*Furman* capital punishment law.

*Id.* at 1368.  By eliminating the consideration of mercy or some other mitigating factor, the prosecutor's closing was improper.  *Id.*

Clayton's counsel did not instruct the jury to disregard the mitigating factors which were argued by Rhoades.  The prosecutor did argue that the mitigating factors did not justify a life sentence.  For example, immediately after the prosecutor made the statement

67

at issue, he discussed Clayton's functioning abilities of a fifth-grader and how that should not be a factor in deciding whether to impose the death penalty. *See* Resp. Ex. A-12 at p. 1854. That does not mean that he asked the jury to ignore the factor. To reject it, the jury had to consider it. Clayton's argument also ignores the prosecutor's directive to the jury to consider the mitigating circumstances set forth in Instruction No. 19. *Id.* at p. 1841.

Additionally, the jury was properly instructed on the law in writing. Instruction No. 19 clearly instructs the jury to consider Clayton's mitigating factors, and Instruction No. 20 similarly instructs the jury that it does not have to impose death, even if the aggravating factors outweigh the mitigating factors. Given those safeguards, the prosecutor's comment did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 642-43.

### W. Claim 23: Due Process Challenge Based on Trial Court's Grant of the State's Motion to Strike Venirepersons Lonnie Houston and Amy Kingry

According to the record, the trial court struck venirepersons Lonnie Houston ("Houston") and Amy Kingry ("Kingry") for cause because Houston and Kingry vacillated and expressed doubt about their ability to impose the death penalty. In *Wainwright v. Witt*, 469 U.S. 412 (1985), the Supreme Court held that a juror in a capital case could be stricken for cause if the juror's philosophy would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* at 424-25. The United States Supreme Court said:

[T]his standard likewise does not require that a juror's bias be proved with

68

'unmistakable clarity.' This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror.

*Id.*

Where a state court has determined that a venireperson cannot satisfactorily serve on a capital jury, federal courts apply a "presumption of correctness" to the state court's finding of fact. 28 U.S.C. § 2254(e)(1)). Habeas courts "defer to the trial judge's decisions regarding bias because the judge's 'predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record.'" *Kinder v. Bowersox*, 272 F.3d 532, 543 (8th Cir. 2001) (citation omitted).

### 1.    *Houston*

During the jury selection colloquy, Houston stated he was "unsure" whether he could vote for the death penalty, but that he could do so in "extreme cases" only. *Clayton*, 995 S.W.2d at 475. He further testified that he could sign a death verdict, but only in "some extreme case" and he could "hardly imagine it." *Id.* Houston also testified:

69

I read the book "Dead Man Walking" this nun wrote down in Louisiana. And she's kind of convincing, if you understand. Well, the death penalty is just dished out to poor people, minorities, such as that, and it costs the state so much more money to put somebody to death than to hold them. That's - She's kind of convinced me of her thinking on that. That's how I feel.

*Id.* In evaluating the state's motion to strike Houston for cause based on his inability to

apply the death penalty but for "extreme" cases, the state trial court said:

And the Court in observing Mr. Houston, I think it started out he could consider. When it got down to those, I heard things like: not sure, hesitant, maybe in extreme cases, might be possible case. And I'll have to say, in looking at his demeanor and way he was hesitant, he took his glasses off several times, I'll have to say that the Court's impression in considering all of those, I believe under *Witherspoon* and *Witt*, that I just think it would prevent him or substantially impair his performance. You know, I have the impression he's unable to faithfully and impartially apply the law in this case.

*Id.* at 476. The Missouri Supreme Court upheld the trial judge's finding and stated:

The record supports the trial court's ruling. The totality of Houston's statements provided a basis for the trial court to conclude that Houston's views on the death penalty would substantially impair his ability to follow the court's instructions.

*Id.* at 476.

Clayton has failed to rebut, or even call into question, the presumption that the

state courts correctly found that Houston was biased. There is ample justification for the

state court's determination.

### 2. *Kingry*

As to Kingry, the Missouri Supreme Court said:

During the state's voir dire, venireperson Kingry expressed doubt that she could vote for the death penalty. She vacillated under questioning by the

70

prosecution, then the defense, as to whether she could follow the law in a capital case. She stated that the 'only way I could vote for it is if I had no doubt, you know, in my mind' and that she would require the prosecutor to prove the case beyond all possible doubt before she could consider the death penalty. When asked if she could sign a death verdict if she were to serve as the foreperson, she responded 'no, no.' The court sustained the state's motion to strike Ms. Kingry for cause.

*Clayton*, 995 S.W.2d at 476. Before sustaining the State's motion to strike Kingry for

cause, the state trial judge said:

> I tell you what, I think I'm going to strike for cause, but let me tell you why. It is - she vacillated. She went back and forth. And I listened. But the whole thing seems to me is she says - And I think that probably the defense is correct, I think you rehabilitated her to the point that she says, 'no, for the first stage, for guilt or innocence, it's - beyond a reasonable doubt is fine. But if I'm going to vote for the death penalty, which is one of the authorized voting, they would have to - I would have to have no doubt.' And I don't think it requires no doubt. The law requires beyond a reasonable doubt on even that one. So I think on that, as I have belief in watching her that - you know, that - I just have - you know, I have an impression that she'd be unable to apply the law in this case when it comes to second stage in the instruction.

*Id.*

Clayton has failed to rebut, or even call into question, the presumption that the

state court correctly found that Kingry was biased. There is ample justification for the

state court's determination.

## X.    Claim 24: Due Process Challenge Based on the Missouri Supreme Court's Proportionality Review

Clayton also contends that the Missouri Supreme Court's proportionality review

violates his constitutional rights. The Missouri Supreme Court conducted a

proportionality review in accordance with Mo. Rev. Stat. § 565.030(3) and held:

71

> Lastly, we must determine whether the sentence of death is excessive or
> disproportionate. In making this determination, we consider similar cases
> where the death penalty was imposed. The death sentence in this case is
> neither excessive nor disproportionate to the penalty imposed in similar
> cases. This Court has upheld sentences of death where the defendant
> commits an execution-style shooting of a defenseless victim. This Court
> has also upheld sentences of death in numerous cases involving killings of
> peace officers, law enforcement, or corrections officers. In light of the
> crime and the strength of the evidence against him, Clayton's sentence of
> death is not excessive or disproportionate.

*Clayton*, 995 S.W.2d at 484 (internal citations omitted). Clayton now asserts the

Missouri Supreme Court violated his due process rights because they compared his case

only to other cases where a death sentence was affirmed, thereby improperly skewing the

outcome of the proportionality review.

Because the state of Missouri has created the right of proportionality review for

persons sentenced to death, "the Fourteenth Amendment . . . entitles [Petitioner] to

procedures to ensure that the right is not arbitrarily denied." *Foster v. Delo*, 39 F.3d 873,

882 (8th Cir. 1994). However, "the Missouri Supreme Court conducted the relevant

review in this case and concluded that the punishment was not disproportionate to that

imposed for similar crimes in similar cases." *Foster*, 39 F.3d at 873. This Court "cannot

look behind the Missouri Supreme Court's conclusion or consider whether that court

misinterpreted the Missouri statute requiring proportionality reviews." *Williams v. Delo*,

82 F.3d 781, 785 (8th Cir. 1996) (citing *LaRette v. Delo*, 44 F.3d 681, 688 (8th Cir.

1995)). Indeed, the Missouri Supreme Court, in *State v. Tokar*, 918 S.W.2d 753, 773

(Mo. 1996), only looked to cases where the death penalty was affirmed under comparable

factual circumstances, and the Eighth Circuit did not find that to be a constitutional violation. *See Tokar v. Bowersox*, 198 F.3d 1039, 1052 (8th Cir. 1999).

### Y.    Claim 25: Due Process Challenge Based on Clayton's Incompetency

Clayton alleges that he was denied due process because he was forced to pursue his trial, appeal, and post-conviction remedies, even though he was incompetent to stand trial and pursue his post-conviction remedies. Clayton's twenty-fifth claim is procedurally barred because he failed to raise it at any time during the underlying state proceedings.

Clayton claims that his incompetence constitutes "cause" for his procedural default. For the same reasons previously given, this does not constitute "cause." The claim is procedurally barred.

### Z.    Claim 26: Due Process Challenge Based on Clayton's Asserted Innocence Because of Lack of Criminal Responsibility

Clayton alleges that he was denied due process because he is actually innocent of killing Castetter. Based on Mo. Rev. Stat. § 552.030(1), Clayton contends that he lacks criminal responsibility for the murder because of his mental impairments. Clayton's twenty-sixth claim is procedurally barred because he failed to raise it at any time during the underlying state proceedings, including his direct appeal of his sentence and the Rule 29.15 proceedings. However, actual innocence can excuse a petitioner's procedural default. *See Hall v. Luebbers*, 296 F.3d 685, 697-98 (8th Cir. 2002) (evidence negating the element of deliberation can constitute actual innocence and overcome a procedural

73

bar) (citing *Schlup v. Delo*, 513 U.S. 298, 324 (1995)).

The first question is whether a mentally impaired defendant is actually innocent or merely legally innocent. If the latter, procedural default is not excused. *Bannister v. Delo*, 100 F.3d 610, 615 (8th Cir. 1996). The Seventh Circuit has found that a person acquitted by reason of insanity is actually innocent. *Britz v. Cowan*, 192 F.3d 1101, 1103 (7th Cir. 1999). So has the Third Circuit in *In re Minarik*, 166 F.3d 591, 607 (3rd Cir. 1999). The Eighth Circuit has held that a petitioner who can demonstrate that a mental defect negated the petitioner's ability to deliberate has also stated a claim of actual innocence, *see Jones v. Delo*, 56 F.3d 878, 883 (8th Cir. 1995), and this suggests that the Eighth Circuit would likewise find that a defendant is actually innocent if he is able to establish the requirements in Mo. Rev. Stat. § 552.030(1). However, the Court need not resolve the issue, because even if Clayton's defense would constitute actual innocence, Clayton's evidence does not show that the requirements of Mo. Rev. Stat. § 552.030(1) have been sufficiently established to justify habeas relief.

In *Schlup*, the United States Supreme Court held that a claim of actual innocence is established if the habeas petitioner has new reliable evidence that was not presented at trial which shows that a constitutional violation has occurred and "that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Schlup*, 513 U.S. at 327. The Eighth Circuit has held that "evidence is new only if it was not available at trial and could not have been discovered earlier through the exercise of due diligence." *Amrine v. Bowersox*, 128 F.3d 1222, 1230 (8th Cir. 1997). *Also see*

74

*Osborne v. Purkett*, 411 F.3d 911, 920 (8th Cir. 2005).

### 1. *Dr. Foster*

Dr. Foster testified at Clayton's post-conviction hearing that Clayton had a mental defect--specifically, dementia, secondary to traumatic injury--at the time of the murder. Dr. Foster also testified about whether Clayton could deliberate on the evening of Castetter's murder. *See* Clayton Ex. G-2 at p. 363:

> Q.   Are you aware of how Missouri law defines deliberation?
>
> A.   I am.
>
> Q.   Do you have an opinion, as to a reasonable degree of psychological certainty, as to whether Mr. Clayton's mental defect prevented him from deliberating before he shot Officer Castetter?
>
> A.   I could find no evidence of motive to kill anyone.  I could find no evidence of intent to kill someone.  The closest would be some suicidal ideation, but he still has some strong internalized values opposing that.  In the time that it took for the shooting to actually occur, I - he had, at least in his recollection to me, all he had was that startled response blank time.  And now, he was on the road driving out of that driveway, as fast as he could go.  I see no, I see no evidence in his recollection, or of the reports that reviewed, that give him time for cool, clear reflection, no matter how brief.  I see no, no time for that.

*Id.* at p. 363:10 to 364:8.

Dr. Foster's testimony regarding Clayton's ability to deliberate is, at best, inconclusive.  First, he states that Clayton did not have a motive for killing Castetter, which is a separate issue from the concept of deliberation.  Next, Dr. Foster states that he does not believe Clayton had time to deliberate, but this is not a matter for expert opinion

and does not indicate Clayton was incapable of deliberating.

Having reviewed all of Dr. Foster's testimony, the Court believes it is unlikely that a jury would give it substantial weight. He had no persuasive explanation for his conclusion that Clayton could not deliberate and it is understandable that the state judge who heard Clayton's Rule 29.15 Motion did not find Dr. Foster's testimony credible. *See Clayton*, 63 S.W.3d at 209.

More importantly, even if Dr. Foster were a credible witness, his testimony undermines Clayton's claim. Clayton's underlying claim is that he was actually innocent because of a mental disease or defect. Mo. Rev. Stat. § 552.030, provides that: "[A] person is not responsible for criminal conduct if, at the time of such conduct, as a result of mental disease or defect such person was incapable of knowing and appreciating the nature, quality, or wrongfulness of such person's conduct." Mo. Rev. Stat. § 552.030(1). On cross examination, Dr. Foster testified that Clayton knew his conduct was wrong and understood the quality and nature of his act. Resp. Ex. G-3 at pp. 464-465**.**

In addition, at Clayton's trial Dr. Back testified that Clayton had the ability to distinguish between right and wrong. She also gave extensive testimony about his brain injury and her opinion that Clayton was not capable of deliberation. In short, Clayton's own expert's testimony shows that he did not meet the criteria for insanity established in Mo. Rev. Stat. § 552.030(1).

### 2. *Dr. Merikangas*

Clayton also states that the testimony of Dr. James Merikangas will support his

76

claim of actual innocence, but he offers no testimony, affidavit or any other evidence from this doctor. *See* Petition [Doc. # 46] at p. 29. After an independent review of the record, the Court has not found any evidence or testimony from Dr. Merikangas at any stage of this proceeding that would support Clayton's claim of actual innocence.

### 3. *Hearing*

Clayton has not offered any evidence to support his claim of actual innocence, but he states, "At an evidentiary hearing, Clayton can present evidence that, absent constitutional error, it is more likely than not that he would have been acquitted." *See* Traverse [Doc. # 65] at p. 68. The Court finds that a hearing is not necessary to evaluate Clayton's claim of actual innocence.

Before a petitioner is entitled to an evidentiary hearing, the petitioner "must allege facts which, if proved, would entitle [the petitioner] to relief." *Bowman v. Gammon*, 85 F.3d 1339, 1343 (8th Cir. 1996) (internal quotations omitted). In assessing the need for an evidentiary hearing, a district court must evaluate "the probative force of the newly presented evidence in connection with the evidence of guilt . . . . [T]he court may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." *Barrington v. Norris*, 49 F.3d 440, 441-42 (8th Cir. 1995). A petitioner must present sufficient facts to warrant a hearing and "the mere fact that affidavits are presented does not automatically require [remand for an evidentiary hearing]." *Battle v. Delo*, 64 F.3d 347 (8th Cir. 1995), *cert. denied*, 517 U.S. 1235 (1996)

Case 4:02-cv-08001-NKL   Document 105   Filed 04/27/06   Page 77 of 82

In *Barrington*, the petitioner merely identified a witness and specified what the witness's exculpatory evidence would be. *Barrington*, 49 F.3d at 441. The petitioner did not present any affidavits nor did she proffer any newly-discovered physical evidence. The district court refused to hold an evidentiary hearing on the petitioner's claim of actual innocence and the Eighth Circuit affirmed, stating: "[W]e do not believe [petitioner] made a sufficient showing of actual innocence to warrant a hearing on the issue. Considering her failure to meet this threshold showing, we conclude the district court properly declined to reach the merits of her petition." *Id.* at 442.

Like the petitioner in *Barrington*, Clayton has not offered sufficient evidence that would justify conducting an evidentiary hearing on his claim of actual innocence. Furthermore, given the testimony of the two experts that Clayton has already proffered, it is unlikely that a third would be persuasive.

### AA. Claim 27: Due Process Challenge Based on Clayton's Alleged Retardation When the Death Penalty Was Imposed

Clayton alleges that he was denied due process because he was sentenced to death even though he was mentally retarded at the time of the offense.

In *Atkins v. Virginia*, 536 U.S. 304 (2002), the United States Supreme Court held that executing mentally retarded criminals violates the Eighth Amendment's prohibition of cruel and unusual punishment. While this decision was made after Clayton exhausted his state remedies, the Court will assume that *Atkins* is retroactive and will assume that Clayton's procedural default is excused. Nonetheless, Clayton has failed to present

78

sufficient evidence that he was mentally retarded at the time of the murder to justify even

a new hearing on the subject.

> Under Missouri law, the term "mentally retarded":
>
> refer[s] to a condition involving substantial limitations in general functioning, characterized by significantly subaverage intellectual functioning with continual extensive related deficits and limitations in two or more adaptive behaviors such as communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work, which conditions are manifested and documented before eighteen years of age.

Mo. Rev. Stat. § 565.030(6).

In *Johnson v. State*, 102 S.W.3d 535 (Mo. 2003) (en banc), the Missouri Supreme

Court remanded the issue of mental retardation to the trial court so it could conduct an

evidentiary hearing regarding the petitioner's mental capacity. The court noted that there

was substantial evidence that the petitioner suffered from a low IQ and that it had

manifested itself prior to age eighteen. *Johnson*, 102 S.W.3d at 540-41. On the other

hand, in *Taylor v. State,* 126 S.W.3d 755 (Mo. 2004) (en banc), the court refused to

remand a petitioner's claim of mental retardation for a hearing where the petitioner

"failed to present any credible evidence in support of his claim that he was mentally

retarded at the time of the offense." *Id.* at 763.

Because the current record clearly shows that Clayton was not mentally retarded

under Missouri law at the time he killed Officer Castetter, it is not necessary to remand

this matter to the state court for resolution.

First, Clayton has not presented evidence that any of his symptoms manifested

79

before the age of eighteen--a necessary requirement under the statutory definition. *See* Mo. Rev. Stat. Mo. Rev. Stat. § 565.030(6). *Also see Atkins*, 536 U.S. at 317 (limiting its holding to mentally retarded individuals who satisfy state standards for retardation). Indeed, it is clear he is relying on his brain injury to support this retardation claim, and that did not occur until Clayton was an adult. Second, while he claims that "he functions at a level which, if it were congenital, would be considered mental retardation . . . by the American Psychiatric Association," *see* Traverse [Doc. # 65] at p. 69, he cites no evidence to support that conclusion. Third, the record refutes his claim that at the time of the murder, or at any time since, he functioned at the level of a mentally retarded person.

Dr. Back stated that Clayton was not retarded when she evaluated him in 2000. Resp. Ex. I-1 at pp. 92-93. Dr. Back evaluated Clayton less than one year after he killed Castetter and his IQ scores placed Clayton within the low average range of intellectual functioning. In Clayton's recent competency assessment at the Medical Center for Federal Prisoners in Springfield, Missouri, he was administered the CAST-MR, and he received scores that were consistent with presumed competent individuals without mental retardation. *See* F.R. [Doc. # 103] at p. 26, submitted by Dr. Preston in connection with Clayton's Renewed Motion for Stay.

Based on the foregoing, neither a hearing nor a remand of this issue to the Missouri courts is necessary to resolve Clayton's twenty-seventh claim for relief. It is denied.

**BB.    Claim 28: Counsel Is Unable to Prepare Other Grounds Because of Clayton's Incompetence**

In his twenty-eighth claim, Clayton claims that he is incompetent to proceed, and his lack of competency has impeded his counsel's ability to develop his claims for relief. For the same reasons discussed by the Court in its Order denying a stay [Doc. # 104], Clayton's twenty-eighth claim is denied.

**CC.    Claim 29: The Cumulative Number of Errors Warrant Relief**

Clayton alleges that he was denied due process because the cumulative effect of procedural errors in his case violated his constitutional rights, even if the individual errors themselves do not rise to the level of a constitutional violation. Clayton's twenty-ninth claim is procedurally barred because he failed to raise it at any time in state court.

Nonetheless, even assuming Clayton's claim was not procedurally barred, it would provide no relief. Under a cumulative error analysis, courts "aggregate[] all errors found to be harmless and analyze[] whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002) (quoting *United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990) (en banc)), *cert. denied* 540 U.S. 1210 (2004). According to *Toles*, "[O]nly actual errors are considered in determining whether a defendant's right to a fair trial has been violated." *Toles*, 297 F.3d at 972. The Court has not found actual error and, therefore, Clayton's cumulative error claim must fail.

Even if the court had found actual error, the evidence of Clayton's guilt is

overwhelming.  In addition, the jury was given extensive evidence about Clayton's brain injury and still decided to impose the death penalty.  Against this backdrop, the Court cannot say that Clayton's right to a fair trial has been impaired.  The Court denies Clayton's twenty-ninth claim for relief.

**DD.    Claim 30: Clayton Is Incompetent to Be Executed**

In this thirtieth and final claim for relief, Clayton asserts that he is incompetent to be executed under the standard set forth in *Ford v. Wainwright*, 477 U.S. 399 (1986).  His recent competency examination shows that he is competent to be executed.  Clayton's thirtieth claim is denied.

**V.    Conclusion**

After careful consideration of each of Clayton's claims for relief, the Court finds that habeas relief is not warranted.  Accordingly, it is hereby

ORDERED that Clayton's Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 in a Capital Case [Doc. # 46] is DENIED.

                                                    s/ Nanette K. Laughrey
                                                    NANETTE K. LAUGHREY
                                                    United States District Judge

DATE:  <u>April 27, 2006</u>
Jefferson City, Missouri